**Richard Leo DEORLE, Plaintiff–Appellant,**

v.

**Greg RUTHERFORD, Butte County Deputy Sheriff; Mick Grey, Butte County Sheriff; County Of Butte, Defendants–Appellees.**

**No. 99–17188.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 12, 2000

Filed March 16, 2001

Amended Opinion Filed Aug. 31, 2001

Second Amended Opinion Filed Nov. 19, 2001

---

Larry L. Baumbach, Law Offices of Larry L. Baumbach, Chico, California, for the plaintiff-appellant.

Michael R. Deems, Stewart, Humpherys, Burchett & Sandelman, Chico, California, for the defendants-appellees.

* The Honorable Myron Bright, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

Before: BRIGHT,* REINHARDT, and SILVERMAN, Circuit Judges.

Opinion by Judge REINHARDT; Dissent by Judge SILVERMAN

## ORDER AND AMENDED OPINION

REINHARDT, Circuit Judge:

### ORDER

The majority opinion filed March 16, 2001 [263 F.3d 1106], as amended August 31, 2001 is further amended as follows:

1) On slip opinion p. 11965, in the paragraph following heading "A. Nature and Quality if Intrusion", replace the citation "*Headwaters Forest Def. v. County of Humboldt*, 240 F.3d 1185, 1198 (9th Cir.2000) (internal quotation marks omitted) (quoting *Chew*, 27 F.3d at 1440)" with:

"*Headwaters Forest Def. v. County of Humboldt*, 240 F.3d 1185, 1198 (9th Cir. 2000) (vacated and remanded on other grounds sub nom. *County of Humboldt v. Headwaters Forest Def.*, —— U.S. ——, 122 S.Ct. 24, 151 L.Ed.2d 1 (2001)) (internal quotation marks omitted) (quoting *Chew*, 27 F.3d at 1440)."

2) Replace the paragraph beginning at the bottom of slip opinion p. 11976 with:

"Although there is no prior case prohibiting the use of this specific type of force in precisely the circumstances here involved, that is insufficient to entitle Rutherford to qualified immunity: notwithstanding the absence of direct precedent, the law may be, as it was here, clearly established. *See Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (rejecting the notion that officer liability cannot

exist 'unless the very action in question has previously been held unlawful'). Otherwise, officers would escape responsibility for the most egregious forms of conduct simply because there was no case on all fours prohibiting that particular manifestation of unconstitutional conduct. When ' "the defendant['s] conduct is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts" that the action was unconstitutional, closely analogous pre-existing case law is not required to show that the law is clearly established.' *Mendoza v. Block,* 27 F.3d 1357, 1361 (9th Cir.1994) (quoting *Casteel v. Pieschek,* 3 F.3d 1050, 1053 (7th Cir.1993)). This is such a case. No reasonable officer could have believed that Rutherford's action in shooting Deorle with the 'less lethal' lead-filled beanbag round was appropriate or lawful. To the contrary, 'it would be clear to a reasonable officer that [Rutherford's] conduct was unlawful.' *Katz,* 121 S.Ct. at 2158. It does not matter that no case of this court directly addresses the use of such weapons; we have held that '[a]n officer is not entitled to qualified immunity on the grounds that the law is not clearly established every time a novel method is used to inflict injury.' *Mendoza,* 27 F.3d at 1362. Given all the circumstances, the error in judgment, such as it was, does not constitute a 'reasonable mistake' of fact or law on Rutherford's part. Viewing the facts in the light most favorable to the plaintiff, Rutherford was not entitled to qualified immunity for his use of excessive force."

Judge Reinhardt has voted to deny the Petition for Rehearing En Banc, and Judge Bright has so recommended. Judge Silverman has voted to grant the Petition for Rehearing En Banc.

The full court was advised of the Petition for Rehearing En Banc. An active judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the active judges in favor of en banc consideration. Fed. R.App. P. 35.

The Petition for Rehearing En Banc is therefore denied.

## OPINION

Police Officer Greg Rutherford fired a "less lethal" lead-filled "beanbag round" into the face of Richard Leo Deorle, an emotionally disturbed resident of Butte County, California, who was walking at a "steady gait" in his direction. He did so although Deorle was unarmed, had not attacked or even touched anyone, had generally obeyed the instructions given him by various police officers, and had not committed any serious offense. Rutherford did not warn Deorle that he would be shot if he physically crossed an undisclosed line or order him to halt. Rutherford simply fired at Deorle when he arrived at a spot Rutherford had predetermined. The projectile Rutherford fired removed Deorle's eye and left lead shot implanted in his skull. We are presented on appeal with two questions: whether the force used was excessive; and, if so, whether Officer Rutherford is nevertheless entitled to qualified immunity because the law was not clearly established or because the officer made an objectively reasonable error in judgment. Both inquiries are a part of the qualified immunity issue on which the district court granted Rutherford summary judgment.

## BACKGROUND [1]

■ On September 9, 1996, in Butte County, California, Richard Deorle (Deorle), upset at being diagnosed with

---

1. When we review an order granting summary judgment to the defendant, we must

Hepatitis C, and having consumed a half-pint of vodka and some Interferon, his prescribed medication, began behaving erratically. By four o'clock, Deorle had become suicidal. According to Mrs. Deorle, having "lost control of himself," Deorle began screaming and banging on the walls of their house. In search of someone to help her with her distressed husband, Mrs. Deorle dialed 911.[2]

Her call was answered by the police, who dispatched Officer Mahon to the Deorle residence. Mrs. Deorle, accompanied by their children, left the house. Deorle did not hinder their departure. He did, however, rather angrily, refuse to let Mahon enter the house without a warrant. Mahon escorted Deorle's family one block from their house, radioed for "Code 3 Backup," and requested that more officers be sent quickly.

At least 13 officers responded to Mahon's request for "backup."[3] These officers set up roadblocks on the streets around the house to ensure that Deorle had no avenue of escape,[4] and awaited the arrival of a Special Incident Response Team ("SIRT") and a team of negotiators.

SIRT members are trained to "arrest ... suspects in the most efficient and least hazardous manner ... [and] arrest suspect[s] with a minimum amount of risk or danger to the ... suspect." Negotiators are "[d]eputies trained in the specialized area of crisis negotiations.... Their role as negotiator is essential to the successful resolution of critical incidents as it relates to conflict resolution."[5]

Deorle, though verbally abusive, was physically compliant and generally followed all the officers' instructions. When a canine team "tested" his behavior by making their police dog bark aggressively at Deorle, he retreated towards his house. When a wooden board from the porch railings came away in his hands, Deorle dropped it at the officers' command. Although shouting "kill me" and brandishing a hatchet at a police officer, he threw the hatchet away into a clump of trees when told to put it down. Still, Deorle remained agitated and continued to roam on or about the property but well within the police roadblocks. Officer Rutherford, who was at the scene for thirty to forty minutes, did not observe Deorle touch, let

---

view the relevant facts in the light most favorable to the plaintiff. *Margolis v. Ryan*, 140 F.3d 850, 852 (9th Cir.1998). That standard also applies to our determination of the defendants' entitlement to qualified immunity as a matter of law. *See Moran v. Washington*, 147 F.3d 839, 844 (9th Cir.1998).

2. Mrs. Deorle testified that, when she dialed 911, Deorle was "just screaming. I don't remember any words, just screaming like in pain." She picked up the phone intending to get medical help, dialed 911, and left the phone on the dresser.

3. Rutherford claims there were between five and ten police officers at Deorle's residence. Appellees' evidence in support of their summary-judgment motion suggests that at least thirteen officers were at the scene when Deorle was shot, and a police log indicates that as many as 24 officers may have been present before or immediately after the shooting.

4. According to the affidavit testimony of various police witnesses, the police secured the area along Creston Road in front of Deorle's house by establishing two roadblocks, one at the intersection of Creston and Sherwood, where Officers Mahon, Muldown, and Collins were stationed, and one at the intersection of Creston and Skyway, staffed by at least two officers, including Officer Hard, but possibly also Sergeant Estes and Officer Johnson. Various officers observed Deorle, who walked up and down Creston Road from one police roadblock to the other and periodically returned to his property or his house.

5. Butte County Sheriff's Department Special Incident Response Team Tactical Manual at 9, 2.

alone attack, anyone; nor had he received any report of any such action on Deorle's part. He did, however, hear Deorle scream at him that he would "kick his ass."

Rutherford was a member of the SIRT team. He was trained in the deployment of force against recalcitrant suspects and had arrived on the scene in response to Mahon's Code 3 call. After a briefing by his superiors and consultation with another officer on the scene, he decided to reconnoiter closer to Deorle, although the negotiators assigned to handle the incident had not yet arrived. Accompanied by officers Estes and Nichols, Rutherford observed Deorle for about five to ten minutes from the cover of some trees before Deorle, carrying an unloaded plastic crossbow in one hand [6] and what may have been a can or a bottle of lighter fluid in the other,[7] started shouting at the officers. Rutherford was armed with a twelve-gauge shotgun loaded with what appellees term a "less-lethal" or "beanbag" round. These rounds are made of lead shot contained in a cloth sack, and are small enough to be fired from a shotgun.[8] The rounds "could have lethal capabilities" at thirty feet, and are potentially lethal at up to fifty feet.[9]

In response to Deorle's taunts, Rutherford shouted at him to put down the crossbow and Deorle "discarded" it.[10] According to Rutherford, Deorle:

walk[ed] directly at me at a steady gate [sic].... He didn't run at me, he didn't take his time getting to me, it was just a steady walk directly at me.... Once he started walking towards me I took a little wider stance with my feet to get a good stable base. As I leaned my weapon up against the tree to make it more stable and I focused on his lower right rib area as he was walking towards me for a target area.[11]

---

**6.** The dissent says that it is unclear whether the crossbow was loaded. If it were unclear, we would be required to assume for purposes of summary judgment that it was not loaded. Here, however, Rutherford, himself, acknowledged that the crossbow was unloaded when he observed Deorle. *See* Transcript of Deposition of Greg Rutherford, dated July 29, 1998 at 60:25–26.

**7.** In his deposition, Rutherford testified at various times that he observed a plastic bottle in Deorle's hand, but stated equally unequivocally at other points that it was a can that he observed. He also stated that it was lighter fluid that Deorle was carrying because he could tell that from the type of container in Deorle's hand. Indeed, in his deposition, Rutherford said that he could distinguish what type of lighter fluid it was—charcoal lighter fluid rather than that used to fill cigarette lighters—because of its container (apparently, whether that container was a can or a plastic bottle). We also note that Rutherford observed the can or bottle at a distance of more than thirty feet.

**8.** The shot is enveloped in cloth to prevent its spreading and peppering the target. The shot, thus encased, is expelled from a twelve-gauge shotgun at a speed of between 280 and 300 feet per second, and delivers a force sufficient to knock someone off his feet and render him incapable of resistance.

**9.** Transcript of Deposition of Greg Rutherford, dated July 29, 1998, at 99:23–24.

**10.** Nowhere in the record is there any mention of any other instruction or order given by Rutherford, or any suggestion that Rutherford told him to drop the bottle or can.

**11.** In a statement given to Sergeant Nickelson of Oroville Police Department on the day in question, Rutherford stated that just prior to shooting Deorle he observed him at a distance of forty feet. Deorle was returning to the grounds of his house from the Sherwood roadblock situated to the west of the house. Rutherford had positioned himself behind a tree in a garden on the east side of the house, between Deorle's property and the Skyway roadblock. According to Sgt. Nickelson, Rutherford told him that he was concerned about "a hostage possibility." "He [Rutherford] said that he was not going to retreat, he knew that he was in a good, secure position.... He could not tell if the crossbow

Rutherford had stationed himself in a garden adjacent to Deorle's house and on its east side. He waited until Deorle, who was walking in an easterly direction on his own property, reached a predetermined point, then fired. He did not warn Deorle that he was going to shoot him. He did not ask him to drop the bottle or can. Nor did he order him to halt. The cloth-cased shot struck Deorle in the face, knocked him off his feet, and lodged "half out of his eye." Deorle suffered multiple fractures to his cranium, loss of his left eye, and lead shot embedded in his skull. A team of negotiators was still en route at the time Rutherford shot Deorle.

Deorle sued Rutherford, Mick Grey (the Butte County Sheriff), the County of Butte, and Defense Technology Corporation (the manufacturer of the cloth-cased shot), for, among other things, excessive force in violation of the fourth amendment. Rutherford and Grey asserted qualified immunity and moved for summary judgment. The district court held that Rutherford was entitled to qualified immunity, that he did not violate Deorle's right to be free from excessive force, and that there was therefore no basis for holding the other defendants liable. The court granted summary judgment for defendants and denied Deorle's motion for reconsideration. This appeal followed.[12]

## STANDARD OF REVIEW

A court reviews de novo the district court's determination regarding qualified immunity. *See Robinson v. Prunty*, 249 F.3d 862, 865–866 (9th Cir.2001). A district court's decision to grant summary judgment is also reviewed de novo. *See Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1043 (9th Cir.1996).

## DISCUSSION

■ The Supreme Court has recently determined the manner in which courts are to proceed when, in an excessive force case brought under 42 U.S.C. § 1983, government officials assert the defense of qualified immunity. *See Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). A court must "consider[ ] in proper sequence" the "requisites of a qualified immunity defense." *Id.* at 2155. First the court must determine, as a "threshold question," whether the plaintiff has shown the deprivation of a constitutional right. *Id.* at 2156. *See also Wilson v. Layne*, 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). If so, the court must then determine whether the right violated was clearly established in a "particularized ... sense: ... the relevant, dispositive inquiry ... is whether it would be clear to a reasonable officer that his

---

was loaded ... Deputy Rutherford said he already believed that less than lethal rounds would be reasonable use of force in this situation.... Deputy Rutherford observed the suspect throw the cross bow to the ground ... [T]he suspect kept coming closer to him and when the suspect went passed [sic] a similar sized tree, approximately 30 feet away from him, he decided that the subject had approached and was in an uncomfortable position for him. Deputy Rutherford felt he was in jeopardy and if he passed the tree, that he would shoot the subject. Deputy Rutherford said the weapon had already been aimed at the suspect when he noticed him approaching with the cross bow. He said that when the

subject got passed [sic] the tree, he shot the round at the subject." Although, after discarding the crossbow, Deorle still possessed a bottle or a can, it appears from Nickelson's report that Rutherford was unable to determine the nature of the container's contents at the time he shot Deorle, and that (be it a bottle or a can) Deorle's possession of the item did not constitute a factor, let alone a significant one, in Rutherford's decision to shoot.

12. The excessive-force claim against Officer Rutherford, which reaches us in the form of a challenge to the court's qualified immunity ruling, is the only issue on appeal.

conduct was unlawful in the situation he confronted." *Katz,* 121 S.Ct. at 2156. Accordingly, we first examine whether the force used to subdue Deorle was excessive as a matter of law.

## I. Excessive Force

We examine the use of force to effect an arrest in light of the Fourth Amendment's prohibition on unreasonable seizures. *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *Chew v. Gates,* 27 F.3d 1432, 1440 (1994). The officer's actions are measured by the standard of objective reasonableness. *Graham,* 490 U.S. at 397, 109 S.Ct. 1865. The reasonableness of the force used to effect a particular seizure, is determined by "careful[ly] balancing ... 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham,* 490 U.S. at 396, 109 S.Ct. 1865 (quoting *Tennessee v. Garner,* 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). As we have held, "[t]he force which [i]s applied must be balanced against the need for that force." *Liston v. County of Riverside,* 120 F.3d 965, 976 (1997). *See also Alexander v. City and County of San Francisco,* 29 F.3d 1355, 1367 (9th Cir.1994).

### A. Nature and Quality of Intrusion

We first assess the quantum of force used to arrest Deorle by considering "the type and amount of force inflicted." *Headwaters Forest Def. v. County of Humboldt,* 240 F.3d 1185, 1198 (9th Cir. 2000) (vacated and remanded on other grounds sub nom. *County of Humboldt v.*

*Headwaters Forest Def.,* —— U.S. ——, 122 S.Ct. 24, 151 L.Ed.2d 1 (2001)) (internal quotation marks omitted) (quoting *Chew,* 27 F.3d at 1440). In the instant case, Rutherford shot Deorle using a lead-filled, "less-lethal" round.[13] This cloth-cased shot, which is something akin to a rubber bullet, is defined as a "long-range impact weapon."[14] It is fired from a 12-gauge shotgun, and calculated to stop "people who are violent or hostile and are threatening injury or death to themselves or others." By Rutherford's own admission, the cloth-cased shot was potentially lethal at thirty feet and could be lethal at distances up to fifty feet. Also by Rutherford's own admission, "[t]he target area for lethal capabilities would probably be the facial area.... If it impacted at the heart it could stop the heart or possibly tear a vital artery." Rutherford shot at Deorle's torso from thirty feet: the round hit Deorle in the head and removed his left eye and lodged pieces of lead shot in his skull.

The force used was obviously enough to cause grave physical injury. It knocked Deorle off his feet, and removed one of his eyes. The force applied through use of the cloth-cased shot can kill a person if it strikes his head or the left side of his chest at a range of under fifty feet. Such force is much greater than that applied through the use of pepper spray, *see Headwaters Forest,* 240 F.3d at 1203, or a painful compliance hold, *see Forrester v. City of San Diego,* 25 F.3d 804, 806 (9th Cir.1994) (police force's "pain compliance unit" dispersed demonstrators using "Orcutt Police Nonchakus"—two sticks of wood connect-

---

13. The appellees also call the cloth-cased shot a "beanbag" round. That euphemism grossly underrates the dangerousness of this projectile. The round is not some sort of "hackey-sack." It is a projectile capable of inflicting serious injury or death, rather than some children's toy.

14. *See* the affidavit of Peter A. Reedy, a Sergeant with the Sacramento Department Force for 20 years, dated March 16, 1999, and filed in support of Deorle's opposition to defendants' motion for summary judgment.

ed at one end by a cord—or using wrist- and arm-twisting and pressure point holds), and more likely to cause a life-threatening injury than most dog bites. *See Vera Cruz v. City of Escondido*, 139 F.3d 659, 663 (9th Cir.1997).

■ However, the cloth-cased shot falls short of deadly force as defined in this circuit: "that force which is reasonably likely to cause *death.*" *Vera Cruz*, 139 F.3d at 663 (emphasis added).[15] The shot is not like a regular bullet—it does not normally rip through soft tissue and bone on contact with the human body. It is designed to knock down a target, rendering the individual incapable of resistance, without (in the normal course of deployment) resulting in death. Nonetheless, the cloth-cased shot constitutes force which has the capability of causing serious injury, and in some instances does so.[16] According to the affidavit of Sergeant Reedy, "[t]he Use of Force Continuum, as used in California, would list an impact weapon high on the schedule of force."[17] Such force, though less than deadly, is not to be deployed lightly. To put it in terms of the test we apply: the degree of force used by Rutherford is permissible only when a strong governmental interest compels the employment of such force.

### B. Governmental Interests at Stake

■ We measure the governmental interests at stake by evaluating a range of factors: they include " '(1) the severity of the crime at issue, (2) whether the suspect pose[d] an immediate threat to the safety of the officers or others . . . (3) whether he [was] actively resisting arrest or attempting to evade arrest by flight,' and any other 'exigent circumstances [that] existed at the time of the arrest.' " *Headwaters Forest*, 240 F.3d at 1198–99 (quoting *Chew*, 27 F.3d at 1440–1441 & n. 5). These factors, however, are simply a means by which to determine objectively "the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97, 109 S.Ct. 1865.

The character of the offense is often an important consideration in determining whether the use of force was justified. *See Chew*, 27 F.3d at 1442 & n. 9; *Headwaters Forest*, 240 F.3d at 1204–1205 (same). In this case, the officers were initially on, or attempting to enter, Deorle's property without a warrant. They arrived, not to arrest him, but to investigate his peculiar behavior. Deorle was clearly a deeply troubled, emotionally disturbed individual. Mrs. Deorle testified that pain, induced by a reaction to his medication, had driven Deorle "out of control. He just didn't want to live any more." Deorle repeatedly asked officers to shoot him. Lt. Estes reported that Deorle shouted he "ha[d] no reason to live . . . that the pain was unbearable, and that he wanted to be done with the pain, and that there was no use in continuing." Officer Johnson, Rutherford's superior, heard

---

15. The extremely high deadly-force standard enunciated in *Vera Cruz* is unique to this circuit. *See id.* at 662–663. In other circuits the standard is "a substantial risk of causing death *or serious bodily injury.*" *See id.* at 661 (emphasis in original), at 663 (citing *Ryder v. City of Topeka*, 814 F.2d 1412, 1416 n. 11 (10th Cir.1987); *Pruitt v. City of Montgomery*, 771 F.2d 1475, 1479 n. 10 (11th Cir.1985); *Robinette v. Barnes*, 854 F.2d 909, 912–913 (6th Cir.1988)).

16. *See, e.g., Student Who Lost Eye Was Shot by Police Using Non–Lethal Weapon*, S.F. Chron., Apr. 10, 2001 at D 6 (The student was simply observing a riot that occurred following the loss of an NCAA final four basketball game by the University of Arizona when an officer shot him with a "beanbag" round).

17. Sergeant Reedy offered his expert opinion that "[i]t would be unreasonable for an officer to use an impact weapon on an unarmed person."

Deorle asking other officers to kill him. Ultimately, Deorle was charged with nothing more than obstructing the police in the performance of their duties. *See* Cal.Penal Code § 69.

Rutherford observed Deorle at close proximity for about five to ten minutes before shooting him. His testimony is that he fired his shotgun as Deorle was walking towards him, at a steady gait, carrying only a bottle or a can in his hand.[18] Rutherford, who was supposed to be reconnoitering and gathering information for the SIRT team to help determine the nature of their response, instead concluded that he occupied a secure position, that he would not retreat from that position, and that he would shoot if Deorle came within a certain range. He steadied himself against a tree, and waited until Deorle reached that point; then, without a command to stop or a warning that force would be employed, pulled the trigger.

■ A desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury. There must be other significant circumstances that warrant the use of such a degree of force at the time it is used. *See Headwaters Forest*, 240 F.3d at 1203 (the fact that the police defendants were increasingly frustrated by the protesters—who had developed techniques such as lock-down devices

to prolong nonviolent civil protests—is irrelevant under *Graham*). Rutherford testified in his deposition that he shot Deorle to prevent the latter from passing him and thereby posing a menace to Rutherford, the public and other officers.[19] However, a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern. In short, an officer's use of force must be objectively reasonable based on his contemporaneous knowledge of the facts. Here, as Rutherford knew, Deorle had discarded his crossbow following Rutherford's instructions to do so, and carried only a bottle or a can with him at the time he was shot. A thorough review of the record reveals that the facts are sufficiently unclear as to what Rutherford believed or feared—reasonable or not—that the determination must be made by a trier of fact, and not, as the dissent does, by portraying the facts in the light most favorable to the moving party.

■ Rutherford's statements must be considered in light of the objective facts and circumstances. Among them are the following: Rutherford had consulted with his senior officers before deciding to reconnoiter. He knew that roadblocks prevented Deorle leaving the area in front of his house—the area in which he was walking back and forth from time to time—and that a number of officers were stationed at each roadblock. During the forty minutes

---

**18.** Deorle was wearing no shirt or shoes, only a pair of cut-off jeans shorts. There was nowhere for him to secrete any weapons.

**19.** We note that there are certain conflicts between the reasons Rutherford provided to Sergeant Nickelson on the day of the shooting and those that he provided during his deposition. In particular, he initially told Sgt. Nickelson that he believed that Deorle might take a neighbor hostage. Furthermore, he did not identify the can or bottle Deorle was carrying, or its contents, as placing him in any particular danger; rather, he said, the threat came

from Deorle's approach to within thirty feet. By the time of his deposition, Rutherford made no mention of a potential hostage situation, instead stating that he was afraid Deorle would approach a police roadblock, staffed by a number of police officers, which separated Deorle from members of the public. In addition, he firmly identified the can or bottle of lighter fluid as the principal source of his anxiety, and he said that "if [Deorle] got passed [sic] me ... he could harm ... myself and other officers," as well as well as neighbors and bystanders.

he had spent at the scene, Rutherford had not observed Deorle attack anyone; nor had he received any report that Deorle had engaged in any such conduct. Deorle had roamed about the area and shouted in an irrational manner, but had not harmed or attempted to harm anyone. Nor had he attempted to flee or escape. "[D]eputies trained in ... crisis negotiations ... [whose] role is essential to the successful resolution of critical incidents" were on their way. Rutherford was stationed in a secure position behind a tree, his line of retreat was clear, and Officer Nichols was stationed almost immediately behind him. Rutherford could easily have avoided a confrontation, and awaited the arrival of the negotiating team by retreating to his original position behind the roadblock. Nothing in the record before us suggests that Rutherford considered other, less dangerous, methods of stopping Deorle. *See Headwaters Forest*, 240 F.3d at 1204 (holding that, before deploying pepper spray, police "were required to consider '[w]hat other tactics if any were available' to effect the arrest"); *Chew*, 27 F.3d at 1443.[20] Rutherford had not seen any bystanders in the immediate area; as far as he was aware, the only neighbors in the vicinity, along with the other police officers, were safely behind the two roadblocks. In sum, the crime being committed, if any, was minor and the danger to Rutherford and others appears to have been minimal, as was the risk of flight. There was no immediate need to subdue Deorle before the negotiators who were part of the response group could arrive and perform their "essential function"; nor had those in charge made a decision to subject Deorle to the use of physical force rather than await their arrival. Considering all the circumstances, at the time

Rutherford fired, the governmental interest in using force capable of causing serious injury was clearly not substantial.

## C. Weighing the Conflicting Interests

■ Whether Rutherford's shooting of Deorle was objectively reasonable requires us to consider whether the degree of force used was necessary, *see Liston*, 120 F.3d at 976, in other words, whether the degree of force used was warranted by the governmental interests at stake. *See Graham*, 490 U.S. at 396, 109 S.Ct. 1865. Here, given all the circumstances—the large number of police officers present, the pending arrival of the negotiators "essential to resolve [such] critical incidents"; the nature of Deorle's conduct (essentially disturbing the peace); Deorle's compliance with the prior commands of the officers; the absence of any physical assault; Deorle's having discarded the crossbow when told to do so and being unarmed at the time he was fired upon—the fact that Deorle was walking on his own property in Rutherford's direction with a can or bottle in his hand is insufficient by any objective measure to justify the force deployed. Our conclusion is strongly supported by Rutherford's failure to give Deorle any warning that he would be shot if he approached any closer, or any order to drop the can or bottle or stop where he was: Deorle certainly could not have been expected to comply with instructions that were never given to him.

■ The problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who

---

20. We note, incidentally, that other officers used a police dog to provoke Deorle: a "police tactic that needlessly or unreasonably creates a dangerous situation necessitating an escalation in the use of force," and a course of action this circuit has expressly refused to endorse. *See Cunningham v. Gates*, 229 F.3d 1271, 1291 n. 23 (9th Cir.2000).

has recently committed a serious offense. In the former instance, increasing the use of force may, in some circumstances at least, exacerbate the situation; in the latter, a heightened use of less-than-lethal force will usually be helpful in bringing a dangerous situation to a swift end. In the case of mentally unbalanced persons, the use of officers and others trained in the art of counseling is ordinarily advisable, where feasible, and may provide the best means of ending a crisis. *See Alexander,* 29 F.3d at 1366 (holding that the police used excessive force, considering all the circumstances, in "storm[ing] the house of a man whom they knew to be a mentally ill ... recluse who had threatened to shoot anybody who entered").[21] Even when an emotionally disturbed individual is "acting out" and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual. We do not adopt a per se rule establishing two different classifications of suspects: mentally disabled persons and serious criminals. Instead, we emphasize that where it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under *Graham,* the reasonableness of the force employed.

We also recognize that police officers' decisions about the appropriate amount of force to use in a given circumstance "are often ... split-second judgments [made] in circumstances that are tense, uncertain, and rapidly evolving." *Graham,* 490 U.S. at 396–97, 109 S.Ct. 1865; *see also Washington v. Lambert,* 98 F.3d 1181, 1186 (9th Cir.1996). However, the situation here was far from that of a lone police officer suddenly confronted by a dangerous armed felon threatening immediate violence: Deorle was eventually charged only with the relatively minor crime of obstructing the police in their effort to subdue him. Rutherford and a host of other officers were at the scene for over half an hour before Rutherford shot the emotionally disturbed Deorle. Rutherford had had an opportunity to observe Deorle for a considerable period of time prior to firing at him. He also had the opportunity to consult with his superiors concerning the tactics to be employed. *Compare Chew,* 27 F.3d at 1432. Moreover, Rutherford possessed a clear line of escape from the position he assumed and a police roadblock or buffer zone had been established behind him. Rutherford and the other officers were awaiting the arrival of skilled negotiators, trained to persuade individuals like Deorle to submit peacefully. The negotiating team had left the station and was on its way to the scene. Nevertheless, Rutherford contemplated shooting Deorle with the "less lethal" round during the entire time Deorle was walking in his direction from the roadblock. In sum, with knowledge of all the relevant circumstances, Rutherford made a calculated and deliberate decision to shoot Doerle when Deorle reached a particular point in his peregrinations: and that is precisely what he did.

 The absence of a warning or an order to halt is also a factor that influ-

---

21. In fact, we suggested that the plaintiff could properly argue at trial "that if the police had halted their activities and then gotten an arrest warrant, this too might have avoided the final tragic confrontation. Given the delay attendant in obtaining the warrant, the police might well have sent the gathered city officials away, and then, without the pressure of their presence, and without the expectation that an inspection could be conducted any time soon, might have allowed events to unfold more slowly." *Id.* at 1365. In other words, we suggested that the waiting period was likely to diffuse a potentially violent situation and prevent loss of life, rather than the contrary.

cences our decision. Shooting a person who is making a disturbance because he walks in the direction of an officer at a steady gait with a can or bottle in his hand is clearly not objectively reasonable. Certainly it is not objectively reasonable to do so when the officer neither orders the individual to stop nor to drop the can or bottle, and does not even warn him that he will be fired upon if he fails to halt. Appropriate warnings comport with actual police practice. Our cases demonstrate that officers provide warnings, where feasible, even when the force used is less than deadly. *See Brewer v. City of Napa*, 210 F.3d 1093, 1094–1095 (9th Cir.2000) (police officer gave warning before setting dog on suspect); *Vera Cruz*, 139 F.3d at 660 (same); *Headwaters Forest*, 240 F.3d at 1193–94 (police warned protesters before use of pepper spray). We do not hold, however, that warnings are required whenever less than deadly force is employed. Rather, we simply determine that such warnings should be given, when feasible, if the use of force may result in serious injury, and that the giving of a warning or the failure to do so is a factor to be considered in applying the *Graham* balancing test. In the present case, the desirability and feasibility of a warning are obvi-

ous. Deorle might never have passed the unannounced, pre-determined spot selected by Rutherford had Rutherford given him a warning or a command to halt. There was ample time to give that order or warning and no reason whatsoever not to do so.[22]

 Viewing the facts presented by the record in the light we must, we conclude that even though Rutherford used force that is classified in this circuit as less than deadly, and that would have been so classified in other circuits as well, the force was excessive compared to the governmental interests at stake. The dissent insists that the undisputed fact is that the force used against Deorle is not reasonably likely to cause serious injury. The "reasonably likely to cause serious injury" inquiry is a part of the deadly-force determination in all other circuits that have defined "deadly force." We have, wisely or not, rejected the test all others employ. *See* n.15, *supra*. In any event, in the case before us, the question is not whether the force was "deadly." The evidence in the record before us makes it clear that, "deadly" or not, the force used by Rutherford is capable of causing serious injury to the person shot, and that such injury may occur in any given instance.[23] Less than deadly force,

**22.** Rutherford does not remember giving a warning; nor do any of the other eleven witnesses mention his doing so when describing the events they saw or heard. At oral argument, appellee's counsel claimed that it was Rutherford's usual practice to give a warning, where possible, before shooting. While Rutherford's testimony to that effect would not have changed our analysis, there is no evidence in the record before us that supports counsel's claim, and certainly no foundational evidence, such as how many times Rutherford had shot people in the past. At most, Rutherford may have shouted "less lethal." Officer Estes claims to have heard Rutherford shout "less-lethal" before firing. Officer Smith claims Rutherford shouted "less-lethal," but cannot remember whether it was before or

after the shot was fired. It is just as likely that both officers heard Lt. Nichols, who admitted that he shouted "less than lethal" after Rutherford fired the cloth-cased shot "so other officers would know what had occurred." That cryptic statement was insufficient to alert a target that force would be deployed, let alone that he would be shot, particularly as the purpose of the announcement was, as Lt. Nichols indicated, otherwise.

**23.** To examine the prospects of serious injury, as does the dissent, on the basis of the assumption that a shot from a shotgun will hit the precise part of the body at which it is aimed by the shooter, is not only unsupported by the record, but contrary to the experience and training of law enforcement agencies. It

like deadly force, may not be used without sufficient reason; rather, it is subject to the *Graham* balancing test. *Chew,* 27 F.3d at 1442. Less than deadly force that may lead to serious injury may be used only when a strong governmental interest warrants its use, and in such circumstances should be preceded by a warning, when feasible. *Id.* at 1442–1443. Under the fourth-amendment objective-reasonableness standard, the shooting violated Deorle's right to be free from unreasonable seizures. *See Graham,* 490 U.S. at 396, 109 S.Ct. 1865 (applying *Garner,* 471 U.S. at 8–9, 105 S.Ct. 1694). We now consider whether Rutherford is protected by the defense of qualified immunity.

## II. Qualified Immunity

■ Rutherford, who was sued in his individual capacity for violating § 1983, has raised the affirmative defense of qualified immunity. The doctrine of qualified immunity insulates government agents against personal liability for money damages for actions taken in good faith pursuant to their discretionary authority. *See Harlow v. Fitzgerald,* 457 U.S. 800, 807, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). More specifically, "governmental officials ... generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. 2727.

■ Here, the test is not simply a reiteration of the *Graham* test which we applied, above: rather, we must determine whether, in using excessive force, the officer made a "reasonable mistake[ ] as to the legality of [his] actions." *Katz,* 121 S.Ct. at 2158. We assume, *arguendo,* that Rutherford thought that the force he used

is hardly unusual for bullets or lead-filled beanbags fired from shotguns to be off the

was not excessive; however, that is not the issue. Rather, the question is whether Rutherford's use of force was premised on a *reasonable* belief that such force was lawful, or, as the Supreme Court recently put it: "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 2156. The Court also explained the purpose of the rule: "[q]ualified immunity operates ... to protect officers from the sometimes hazy border between excessive and acceptable force." *Id.* at 2158. It helps, therefore, to begin our discussion with the observation that, on the basis of the facts we have discussed, this is by no means a borderline case. It should have been clear to any reasonable officer that, under the circumstances present, firing at Deorle was objectively unreasonable.

Every police officer should know that it is objectively unreasonable to shoot—even with lead shot wrapped in a cloth case—an unarmed man who: has committed no serious offense, is mentally or emotionally disturbed, has been given no warning of the imminent use of such a significant degree of force, poses no risk of flight, and presents no objectively reasonable threat to the safety of the officer or other individuals. Here, all those factors were present. Deorle had complied with the police officers' instructions, had discarded his potential weapons whenever asked to do so, and had not assaulted anyone; in addition, a team of negotiators essential to resolving such situations was en route.

■ Although there is no prior case prohibiting the use of this specific type of force in precisely the circumstances here involved, that is insufficient to entitle Rutherford to qualified immunity: notwithstanding the absence of direct precedent, the law may be, as it was here,

mark.

clearly established. *See Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (rejecting the notion that officer liability cannot exist "unless the very action in question has previously been held unlawful"). Otherwise, officers would escape responsibility for the most egregious forms of conduct simply because there was no case on all fours prohibiting that particular manifestation of unconstitutional conduct. When " 'the defendant['s] conduct is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts' that the action was unconstitutional, closely analogous pre-existing case law is not required to show that the law is clearly established." *Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir.1994) (quoting *Casteel v. Pieschek*, 3 F.3d 1050, 1053 (7th Cir.1993)). This is such a case. No reasonable officer could have believed that Rutherford's action in shooting Deorle with the "less lethal" lead-filled beanbag round was appropriate or lawful. To the contrary, "it would be clear to a reasonable officer that [Rutherford's] conduct was unlawful." *Katz*, 121 S.Ct. at 2158. It does not matter that no case of this court directly addresses the use of such weapons; we have held that "[a]n officer is not entitled to qualified immunity on the grounds that the law is not clearly established every time a novel method is used to inflict injury." *Mendoza*, 27 F.3d at 1362. Given all the circumstances, the error in judgment, such as it was, does not constitute a "reasonable mistake" of fact or law on Rutherford's part. Viewing the facts in the light most favorable to the plaintiff, Rutherford was not entitled to qualified immunity for his use of excessive force.

## CONCLUSION

Viewing the facts in the light we must, we conclude that, for purposes of summary judgment:

Rutherford's use of force was excessive and the defense of qualified immunity is unavailing. The degree of force was plainly in excess of the governmental interest at stake. The law was clear that Rutherford's shooting of Deorle was in violation of Deorle's constitutional rights, and there was no reasonable basis for any factual or legal misperception on Rutherford's part: no reasonable officer could have concluded that the force employed was appropriate or lawful.

Accordingly, we reverse the grant of summary judgment and remand for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

SILVERMAN, Circuit Judge, dissenting:

The essential facts are not disputed. Plaintiff Richard Deorle was deranged and out of control when Deorle's wife made her 911 call to the police. When Deorle saw his wife on the telephone calling for help, he told her that they would have to come kill him.

After the first deputy sheriff (Mahon) arrived at the scene, Deorle was observed holding a two-by-six board with nails protruding from the end of it. According to Mrs. Deorle's taped-recorded statement on the day in question, Deorle "was so angry, that he just started lifting up the porch, you know the board, it has a railing and he lifted up the railing and he was like swinging it" like a baseball bat. At her deposition held three years later, Mrs. Deorle stated that he was "screaming" but not swinging the board around. Either way, the undisputed fact is that Deorle, while screaming and on a rampage, was in possession of a board with protruding nails, and that he finally dropped it when Mahon took his pistol out of his holster.

Mahon was able to get Deorle's wife and children safely into his police car. Mrs. Deorle told Mahon that Deorle was de-

pressed, that he had been drinking, that he was in a rage caused by his medication, that he previously had been arrested for assaulting her in a domestic incident, and that he had been on probation.

It is undisputed that after dropping the board, Deorle picked up two hatchets and a crossbow. According to Mrs. Deorle, the crossbow was of the type used for recreational target shooting, not hunting, and that "it does look serious." In her tape-recorded interview, she recalled that when the police on the scene asked her whether her husband had any weapons, she told them, "No, except he has a crossbow." [1]

Lt. Estes heard Deorle say that he wanted to die and that he would kill anyone who came on his property. It was around this time that Deputy Rutherford arrived at the scene and was briefed on all of the above. Deorle dropped the hatchets, but continued to hold the crossbow in his right hand. In his left hand he was carrying a can of lighter fluid. He dropped the crossbow, advanced toward Rutherford and then said something to the effect of, "I'm going to kick your ass, motherfucker."

It is undisputed that Rutherford was trained in the proper use of the so-called beanbag round, which is designed to knockdown and incapacitate a person so that an arrest can be effected. The majority is right; it is not a toy, but it is not designed to kill or injure. To the contrary, it is designed to prevent serious injury. Although virtually anything can cause death or serious injury under the right circumstances and the beanbag

round is no exception, *see Vera Cruz v. City of Escondido*, 139 F.3d 659 (9th Cir. 1997), the undisputed evidence established that the firing of a beanbag round from a 12–gauge shotgun at a person's "center mass" from a distance of 20 to 40 feet is not reasonably likely to cause death or serious injury. Furthermore, the evidence is uncontradicted that the beanbag round was fired at Deorle's lower right abdomen but that it suddenly "flew up" and unexpectedly and unintendedly hit Deorle in the face.[2]

Under *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the first issue is whether, taken in the light most favorable to Deorle, the facts show that a constitutional right was violated. The undisputed facts show that it was not. Deorle may have been sick, he may have been deranged, but that did not make him any less dangerous to the officers who responded to Mrs. Deorle's call for help. Deorle advanced toward Rutherford, threatening to harm him, while brandishing a quart can of lighter fluid. Rutherford had no duty to wait to be doused with a flammable liquid or to be set ablaze before acting to protect himself. The majority's insistence on portraying Deorle as unarmed is simply incorrect. He was armed with a container of lighter fluid and was advancing toward Rutherford while threatening to kick his ass. Rutherford may not have had the right to use deadly force at that point, but he had every right to protect himself with a degree of force likely only to temporarily incapacitate. That is what he did.

1. It is unclear whether the crossbow was loaded. However, two days after the incident, when asked in a recorded interview about whether the crossbow was loaded, Deorle replied, "Yeah, but shit, it wouldn't even put a hole in that wall right here." He also stated that the crossbow fired a "little arrow" that "basically" had a standard point like on a normal arrow. There is nothing in

the record to suggest that the crossbow was a child's toy or looked like one.

2. It is interesting to note that the declaration of retired Sacramento Police Department Sgt. Peter A. Reedy, which is referred to twice in the majority opinion, contains not one word indicating that Sgt. Reedy has any experience, training or expertise with beanbag rounds.

True, Rutherford did not issue a warning before firing the beanbag round at the advancing Deorle, but there is no telling, even in hindsight, what Deorle might have done had a warning been issued. Only a short time earlier, Deorle told his wife that he wanted to die and that if the police came on his property they would have to kill him—and Rutherford knew that. Deorle might have surrendered, but he also might have attempted to set Rutherford on fire or engage in self-immolation. Deorle also might have kept on coming, and if he got closer than 20 feet away, the beanbag round could not have been used. Then hand-to-hand combat would have been inevitable, which is not without its own serious, sometimes life-threatening, risks to suspects and officers alike. Under the circumstances, it was not objectively unreasonable for Rutherford to attempt to safely and preemptively subdue him as he did. *See Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). As the Court said in *Saucier,* "If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." 121 S.Ct. at 2158. Under *Saucier,* that should end the inquiry.

But even if Rutherford were mistaken about whether the amount of force he used was legal in the circumstances, the issue under the second part of the *Saucier* sequential analysis becomes whether the officer's *mistake* was reasonable. *Id.* "An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense." *Id.* This turns on whether the officer's conduct violated a "clearly established rule." *Id.* at 2160.

The facts outlined above demonstrate that Rutherford's response to Deorle's threatening actions, even if excessive, even if mistaken, was not an unreasonable mistake. It did not violate any clearly established rule. It is undisputed that he deployed a degree of force that he was trained to use and that he reasonably believed would subdue the advancing and threatening Deorle without doing any significant harm. Neither Deorle nor the majority, as required by the Supreme Court, "has identified any case demonstrating a clearly established rule prohibiting the officer from acting as he did." *Id.* The majority admits that "there is no prior case prohibiting the use of this specific type of force in precisely the circumstances here involved." Majority Op. at 1285. In fact, the best the majority can come up with is cases involving the use of pain compliance techniques, not in self-defense, but to disperse nonviolent protestors (*Forrester v. City of San Diego,* 25 F.3d 804 (9th Cir.1994); *Headwaters Forest Def. v. County of Humboldt,* 240 F.3d 1185 (9th Cir.2000)). Likewise, *Alexander v. City and County of San Francisco,* 29 F.3d 1355, 1366 (9th Cir.1994) concerns the circumstances under which the police may storm a house, not self-defense. Neither *Brewer v. City of Napa,* 210 F.3d 1093 (9th Cir.2000) nor *Headwaters Forest* held that warnings are required before deploying force. But even if they did, which they don't, they were decided four years *after* Rutherford's encounter with Deorle.

Because I believe that Rutherford was entitled to qualified immunity, I would affirm the granting of summary judgment in his favor and in favor of the Sheriff of Butte County. Accordingly, I respectfully dissent.