*1101 NGUYEN, Circuit Judge,
dissenting:
The majority goes badly astray because it loses sight of the specific context of this case and employs hindsight rather than viewing the scene through the eyes of a reasonable officer. Blondín interjected himself into a rapidly-evolving, highly volatile scene: officers struggling to restrain a combative, armed man in the process of trying to take his own life. At the time Blondín was tased, two loaded firearms were unsecured. Yet, at every turn, the majority attempts to minimize the precariousness of the situation, thinly splicing the facts to assess Blondin’s conduct—and the reasonableness of the officers’ response— in a vacuum. It is one thing to resolve disputed facts and inferences in Blondin’s favor. But the majority goes well beyond this by choosing to ignore undisputed facts which do not favor Blondin’s case. By discounting the danger and abstracting the qualified immunity inquiry, the majority’s approach fails to accord appropriate deference to an officer’s reasonable judgment exercised under exigent circumstances. Because the majority fails to follow the Supreme Court’s dictate to assess the use of force “from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight[,]” Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), I respectfully dissent.
I.
A.
“Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.” Ashcroft v. al-Kidd, — U.S. -, 131 S.Ct. 2074, 2085, 179 L.Ed.2d 1149 (2011). The doctrine protects government officials “from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.” Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In evaluating whether a constitutional right was clearly established at the time of the conduct, the Supreme Court has instructed us to ask whether its contours were “ ‘sufficiently clear’ that every ‘reasonable official would have understood that what he is doing violates that right.’ ” ah-Kidd, 131 S.Ct. at 2083 (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). While “[w]e do not require a case directly on point, ... existing precedent must have placed the statutory or constitutional question beyond debate.” Id.
In applying the “cleárly established” rule, we must be careful to “faithfully guard[ ] ‘the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority.’ ” Mottos v. Agarano, 661 F.3d 433, 442 (9th Cir.2011) (en banc) (quoting Harlow, 457 U.S. at 807, 102 S.Ct. 2727). “We must also allow ‘for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.’ ” Id. (quoting Graham, 490 U.S. at 396-97, 109 S.Ct. 1865).
B.
Was the law sufficiently clear on the evening of May 4, 2008 such that any reasonable officer would have known that tasing Blondín for two seconds was an excessive use of force in light of the specific circumstances? I think not.
For starters, consider the undisputed facts. Officers responded to a 911 call regarding a suicide-in-progress. Suicide calls are dangerous, as a suicidal suspect *1102 can quickly become homicidal. Any officer attempting to stop someone in the process of committing suicide faces a risk that the suspect will try to take out others along with him, or choose to “go out in a blaze of glory” and open fire in the hope that he will be gunned down by return fire (known colloquially as “suicide-by-cop”). Here, moreover, the officers had been specifically warned by the person who called 911 (a family member of the suicidal man, Jack Hawes) that Hawes owned a gun and would have it with him.
When the officers arrived, they observed Hawes sitting in his vehicle, running an exhaust pipe into one of the windows. They couldn’t see his weapon. Hawes complied with their orders to step out of the vehicle, but refused to obey orders to show his hands. A scuffle ensued as the officers attempted to restrain, locate his weapon, and secure him.
Enter Blondín. Wearing shorts and slippers, Blondín suddenly approached the scene, yelling ‘What are you doing to Jack?” (Note the accusatory phrasing of this question: not “What’s going on here?” or “Is everything alright, officers?” but “What are you doing to Jack?”) Blondin’s presence and question signaled to the officers that (1) Blondín was not a random passerby, but someone who had come out of his house to see what was going on; (2) Blondín knew the suspect on a first name basis; and (3) Blondín was concerned that the officers were “doing” something to his friend/neighbor.
The parties dispute how far Blondín was standing from the fray, but accepting Blondin’s view (as we must), he was thirty-seven feet away from where Hawes was struggling with the officers. This is not terribly far; to put it in perspective, thirty-seven feet is little more than half the distance between the pitcher’s mound and home plate.[1] During his deposition (and again in a declaration) Blondín recounted how, in response to his question about what they were doing to Jack, an officer yelled at him to “get back.”'[2] According to a passerby who testified on Blondin’s behalf, officers ordered Blondín to get back five or six separate times. Yet, for approximately fifteen seconds, Blondín stood inexplicably “frozen,” refusing to comply with officers’ orders. The majority dismisses this as a mere “momentary failure to move[,]” op. at 1094, but fifteen seconds is a long time to remain motionless when multiple police officers are yelling at you to retreat. (Try counting to fifteen one-thousand out loud, and see for yourself.)
Although the majority makes much of a passerby’s testimony that, in his opinion, Blondín was frozen “with fear,” op. at 1091, Blondín did nothing that would objectively convey to the officers why he was refusing to back away. View the scene from a reasonable officer’s perspective, as the Supreme Court tells us we must: officers were in the midst of tense, rapidly-evolving circumstances, trying to restrain a combative suicidal man with an unsecured firearm. One of the officers, Deputy *1103 Bowman, had his back facing the direction in which Blondín was approaching, with a loaded, unsecured rifle slung on his back. Suddenly, a man who knew the suspect purposely interjected himself into the scene, demanded to know what was going on, and refused to comply .with.repeated commands to retreat—even when warned that he would be tased if he didn’t do so.
Even if we assume that Sgt. Shelton’s use of force was excessive, why wasn’t his mistake reasonable? What precedent existed in May 2008 such that every reasonable officer, would have understood that it was unlawful to tase Blondín for two seconds under these circumstances? Which case placed this constitutional question “beyond debate” in 2008? alr-Kidd, 13,1 S.Ct. at 2083. I don’t know. Nor is’ it evident from the majority’s opinion, which, rather than squarely addressing these questions, re-frames the inquiry instead.
The issue here, the majority says, is whether “the right to be free from nontrivial force for engaging in mere passive resistance was clearly established prior to 2008.” Op. at 1092-93; see also op. at 1088-89 (“We must decide whether it was clearly established as of 2008 that the use of a taser in dart mode against a passive bystander amounts to unconstitutionally excessive force within the meaning of the Fourth Amendment.”). This formulation is wrong in two respects. First, it contravenes the Supreme Court’s instruction that the qualified immunity inquiry “must be undertaken in light of the specific context of the case, not as a broad general proposition.” Saucier, 533 U.S. at 201, 121 S.Ct. 2151. Indeed, the Court has expressly taken us to task for failing in this regard. See alr-Kidd, 131 S.Ct. at 2084 (“We have repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.”) (internal citations omitted).[3] I recognize that the inquiry need not be so narrowly defined'as to allow the officers to “define away all potential claims.” Nelson v. City of Davis, 685 F.3d 867, 883-84 (9th Cir.2012) (quoting Kelley v. Borg, 60 F.3d 664, 667 (9th Cir.1995)). However, by analyzing whether Blondin’s right was clearly established without reference to the specific factual context, the majority not only brushes off the Supreme Court’s instructions, it departs from the same cases upon which it goes on to rely. See, e.g., See Nelson v. City of Davis, 685 F.3d 867, 884 (9th Cir.2012) (“All that remains is to determine whether the law was sufficiently clearly established that a reasonable officer would have been on notice that the use of pepperball projectiles directed towards [the plaintiff] and his friends was unreasonable under the circumstances.”); Headwaters Forest Def v. Cnty. of Humboldt, 276 F.3d 1125, 1130 (9th Cir.2002) (concluding that “it would be clear to a reasonable officer that using pepper spray against the protestors was excessive under the circumstances”).
Second, as I’ve already suggested, the majority’s factual characterization is somewhat misleading. Blondín, for example, was not a simply a “passive bystander[,]” op. at 1089—he came out of his house in slippers, demanding to know what the officers were “doing to Jack.” Likewise, describing Blondin’s conduct as a “total lack of resistance,” op. at 1096, obscures the *1104 undisputed fact that Blondín repeatedly failed to comply with officers’ orders to retreat. While the majority emphasizes that Blondín was initially given a “contradictory” order to stop, op. at 1092; see also op. at 1093, Blondin’s own testimony refutes the majority’s supposition that he froze in an effort to comply, or out. of confusion. Dismissing Blondin’s non-compliance as “mere passive resistance” also unfairly imports the benefit of hindsight; in the heat of the moment, Sgt. Shelton didn’t know whether Blondin’s resistance was going to be “merely” passive, or whether Blondín was going to suddenly bolt in Hawes’s direction. In this sense, the majority’s post-hoc confidence in Blon-din’s passivity undercuts the very point of the inquiry: whether, under the circumstances, an officer could have reasonably interpreted Blondin’s inexplicable noncompliance as a threat.
Lastly, even if the majority is correct that we may look to cases which do not involve tasers, op. at 1094, framing our inquiry in terms of “non-trivial force” still paints with too broad a brush. All “nontrivial force” is not created alike. Here, specifically, the majority employs “nontrivial force” to mean tasing someone for two seconds in dart mode. But “non-trivial force” also covers, among other things, firing a lead-filled beanbag round into someone’s face with enough force to gouge out their eye, fracture their cranium, and leave a lead shot embedded in their skull. See Deorle v. Rutherford, 272 F.3d 1272, 1286 (9th Cir.2001). Any reasonable officer might know that the constitution would prohibit firing a lead-filled beanbag round into Blondin’s face from short range. But tasing him for two seconds? That’s a much closer call. Thus, in my view, asking whether law regarding the use of “nontrivial force” was clearly established is not a fair benchmark by which to gauge an reasonable officer’s understanding of the legality of his actions.
Moreover, I fail to see how the cases relied upon by the majority made the “contours [of Blondin’s right] sufficiently clear that every reasonable official would have understood that what [Sgt. Shelton did] violated that right.” Mottos, 661 F.3d at 442 (citation and internal quotation marks omitted). ' While precedent need not be squarely on all fours, see alr-Kidd, 131 S.Ct. at 2083, we nevertheless require “closely analogous pre-existing case law” to show that the law is clearly established. Deorle, 272 F.3d at 1275 (emphasis added).
Here, the cases which the majority concludes set forth clearly established law are far from closely analogous. To wit, it relies upon: (1) Nelson v. City of Davis, 685 F.3d 867 (9th Cir.2012), in which an officer shot a college student in the eye with a pepperball projectile without any warning, causing him multiple surgeries, permanent eye injuries, and ultimately the loss of his college scholarship, where the student did not disobey police orders (which weren’t even given until after the projectile was shot), but was merely part of a large party that police were trying to break up, id. at 873-74, 881; (2) Deorle v. Rutherford, 272 F.3d 1272 (9th Cir.2001), which involved an officer who—again, without warning—fired a lead-filled beanbag round into the face of an unarmed suicidal man who had complied with officers’ instructions, resulting in the loss of the man’s left eye and other serious injuries, id. at 1285-86; (3) Headwaters Forest Def. v. Cnty. of Humboldt, 276 F.3d 1125 (9th Cir.2002), in which officers sprayed peaceful protestors in the face with pepper spray from a few feet away, forcibly pried open protesters’ eyes, and stuck in Q-tips containing pepper spray, id. at 1128-29; and (4) Casey v. City of Fed. Heights, 509 F.3d 1278 (10th Cir.2007), a Tenth Circuit case in which a plaintiff who was peacefully returning to the courthouse (where he had unsuccessfully challenged a traffic ticket) with a file *1105 he should not have removed “had his shirt torn, and then [was] tackled, Tasered, knocked to the ground by a bevy of police officers, beaten, and Tasered again, all without warning or explanation[,]” id. at 1285.[4] I strongly disagree with the majority’s conclusion that, in light of this precedent, every reasonable officer would know that tasing Blondín for two seconds under the circumstances presented constituted excessive force. See Mottos, 661 F.3d at 448.
One final point. In three recent cases involving the use of tasers in dart mode, we granted officers qualified immunity upon concluding that the law was not sufficiently clear as of 2005 and 2006 to render the alleged constitutional violations clearly established. See Mottos v. Agarano, 661 F.3d 433, 452 (9th Cir.2011) (en banc); Brooks v. City of Seattle, reviewed jointly with Mottos, 661 F.3d at 443-18; Bryan v. MacPherson, 630 F.3d 805, 833 (9th Cir. 2010). And, as the district court correctly recognized, “[b]y May 2008, the state of the law in this circuit was no clearer; no Supreme Court or Ninth Circuit opinion was issued in the interim.” The majority nevertheless asserts that Mottos, Brooks, and Bryan are distinguishable in “one critical respect: Blondín engaged in no behavior that could have been perceived by Sgt. Shelton as threatening or resisting.” Op. at 1094. This assertion, however, is not only shaded with the benefit of hindsight, it is inconsistent with undisputed facts in the record. Blondín did engage in behavior that could have objectively been perceived as resisting, if not threatening: for fifteen seconds he refused to comply with officers’ repeated orders to back away from a dangerous, volatile Scene. Accordingly, Blon-din’s purported lack of resistance cannot justify departing from the holdings in Mot-tos, Brooks, and Bryan.
% ifc * 5¡í H* %
In sum, I believe that the law did not clearly establish that Sgt. Shelton’s conduct violated Blondin’s constitutional rights. I therefore would affirm the district court’s holding that the officers are entitled to qualified immunity on Blondin’s excessive force claim.
II.
The same errors which permeate the majority’s analysis of Blondin’s excessive force claim also taint its discussion of Blondin’s claims for unlawful arrest and malicious prosecution. To succeed on both of these claims, Blondín must establish the absence of probable cause. See Lacey v. Maricopa Cnty., 693 F.3d 896, 918 (9th Cir.2012) (en banc) (“A claim for unlawful arrest is cognizable under § 1983 as a violation of the Fourth Amendment, provided the arrest was without probable cause or other justification.”) (citation omitted) (emphasis added); id. at 919 (“To claim malicious prosecution, a petitioner must allege that the defendants prosecuted her with malice and without' probable cause, and that they did so for the purpose of denying her equal protection or another specific constitutional right.”) (citation and internal quotation marks omitted) (emphasis added).
Blondín was arrested for obstruction under a Washington statute providing that “a person is guilty of obstructing a law enforcement officer if the person willfully hinders, delays or obstructs any law enforcement officer in the discharge of his or her official powers or duties.” RCW *1106 9A.76.020. Whether there was probable cause to arrest Blondin for violating this statute is a far easier hurdle to clear than the majority suggests.
In my view, the undisputed facts show that Sgt. Shelton had probable cause to arrest Blondin for obstruction. As the Supreme Court has explained, “it is clear that ‘only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.’ ” Illinois v. Gates, 462 U.S. 213, 235, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (citation omitted). Under the totality of circumstances, there was at least a reasonable probability that Blondin’s knowing refusal to comply with officers’ repeated orders to back away from an active crime scene diverted their attention from performance of their official duties and created a potential safety hazard. A reasonable officer therefore had at least probable cause to believe that Blon-din was obstructing the officers’ efforts to restrain Hawes and secure his firearm.
Accordingly, I would affirm the grant of summary judgment on both the unlawful arrest and malicious prosecution claims.
III.
Nor do I agree with the majority that Kristi Gravelet-Blondin’s state-law outrage claim should survive summary judgment. To succeed on this claim, the alleged misconduct must be “so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.” Kloepfel v. Bokor, 149 Wash.2d 192, 66 P.3d 630, 632 (2003) (citation omitted). Factors that courts may consider in conducting this analysis include “the position occupied by the defendant, whether the plaintiff was peculiarly susceptible to emotional distress, the defendant’s knowledge of such fact and whether defendant’s conduct may have been privileged under the circumstances.” Grimsby v. Samson, 85 Wash.2d 52, 530 P.2d 291, 295 (1975); see also Spurrell v. Bloch, 40 Wash.App. 854, 701 P.2d 529, 535 (1985).
Taking its cue from the district court, the majority hones in on whether Ms. Blondin ' was particularly susceptible to emotional distress, and if the defendants knew this fact. Op. at 1099-1101. But even accepting that, as Blondin’s wife, Ms. Blondin was “particularly susceptible” to distress upon seeing him tased (and that Sgt. Shelton knew as much), this is still not enough to create a triable issue of fact as to whether the conduct was sufficiently extreme. It is undisputed that Sgt. Shelton tased Blondin for only two seconds following Blondin’s refusal to comply with repeated orders. It is also undisputed that immediately after Blondin was tased, officers summoned paramedics to remove the barbs and check his vital signs.[5]
Under the totality of circumstances I believe that no reasonable juror could conclude that Sgt. Shelton’s conduct was atrocious, extreme, or beyond all possible bounds of decency. Grimsby, 530 P.2d at 295. Accordingly, I would affirm the district court’s grant of summary judgment on Ms. Blondin’s common law outrage claim.
IV.
In sum, I would hold that the officers are entitled to qualified immunity, and that the Blondins’ unlawful arrest and common law claims fail as a matter of law. I therefore respectfully dissent.

. See Major League Baseball, http://mlb.mlb. com/mlb/official_info/ basebalLba-sics/on_the_field.jsp# (last visited Aug. 15, 2013) (distance between the pitcher’s mound and home plate is 60 feet, 6 inches).

. Although there is some, evidence in the record indicating that one officer also yelled at Blondín to stop, nothing in Blondin’s deposition testimony or declaration indicates that he heard this order and tried to comply, or even that he was confused about whether to stop or get back. Rather, Blondín concedes that he knew he was ordered to “get back” but explained that he failed to comply because: "I don’t know why.... I tried to make my feet move. I tried to get out of there, it just didn’t work.” Moreover, it is undisputed that Blon-dín was ordered to "get back” multiple times after the purportedly contradictory command to stop.

. There may be an exception to this rule: When "the defendant's conduct is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts that the action was unconstitutional, closely analogous pre-exist-ing case law is not required to show that the law- is clearly established.” Deorle v. Rutherford, 272 F.3d 1272, 1286 (9th Cir.2001) (citation, internal quotation marks, and alteration omitted). However, the majority does not appear to contend that this case is so patently egregious such that officers required no specific guidance from caselaw.

. The majority also mentions other out-of-circuit taser cases in a footnote, op. at 1093-94, n.6, for purposes of distinguishing them from taser cases in our circuit. It does not, however, appear to rely on these cases as support for its conclusion that the law was clearly established.

. Blondin declined further medical attention.