[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APR 20, 2010
JOHN LEY
CLERK

No. 09-11078
_____

D. C. Docket No. 07-00052-CV-CDL-4

WILLIE L. GLENN, as Personal
Representative of the Estate
of Lester Zachary,
KAREN ZACHARY, Individually, and
As Next Friend of Lester Zachary,

Plaintiffs-Appellees,

versus

CITY OF COLUMBUS, GEORGIA,
RICHARD BOREN, Individually,
and In his Official Capacity
as Chief of Police, et al.,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Middle District of Georgia
_____

(April 20, 2010)

Before BLACK, MARCUS and HIGGINBOTHAM,[*] Circuit Judges.

_____

[*] Honorable Patrick E. Higginbotham, United States Circuit Judge for the Fifth Circuit,
sitting by designation.

PER CURIAM:

In this tragic excessive force case, Columbus, Georgia, police officers Gary Bolen, Kenneth Hudson, Joseph Coats, and Gregory Touchberry appeal the district court's denial of their motion for summary judgment on the basis of qualified immunity. The representatives of Lester Zachary's estate claim that Officer Coats and Sergeants Touchberry and Hudson violated Zachary's rights under the Fourth Amendment when they fatally shot him with a beanbag gun in the early morning hours of April 4, 2005. The estate also says that Officer Bolen violated Zachary's constitutional rights when he prepared a training manual that incorrectly advised officers to aim the beanbag gun at the target's center mass at distances of twenty to forty feet.

After thorough review, we conclude that the officers are entitled to qualified immunity. The officers' use of a beanbag gun under the tense and dangerous circumstances of this case was not clearly established to be illegal. Accordingly, we reverse the denial of qualified immunity and remand for further proceedings consistent with this opinion.

I.

A.

We review de novo a district court's disposition of a summary judgment motion based on qualified immunity. Lee v. Ferraro, 284 F.3d 1188, 1190 (11th

Cir. 2002).  Summary judgment is appropriate if "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." McCullough v. Antolini, 559 F.3d 1201, 1204-05 (11th Cir. 2009) (citation omitted).  Moreover, we are "required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the [summary judgment] motion."  Scott v. Harris, 550 U.S. 372, 378 (2007) (citation and quotation marks omitted) (alteration in the original).  Because the plaintiff is deceased, and because Helen Stephens, the only other non-officer witness to the entire event, could not recall the incident when she was deposed, we necessarily derive many of the facts from the officers' accounts of the shooting and from the 911 transcript.  Nevertheless, "where there is a discrepancy between the statements of the defendants, we have resolved the dispute by using only those statements most favorable to the plaintiff." McCullough, 559 F.3d at 1202.

B.

This sad story began around 3:00 in the morning on April 4, 2005, when Lester Zachary, a veteran plagued with mental illness and recurring dreams of deaths he had witnessed in wartime, awoke with bad dreams. He called the Veteran's Administration ["VA"] Hospital tele-nurse line to ask for help managing the nightmare and his anxiety. In that call, Zachary told the nurse that he had been

3

dreaming of killing children, and that he was armed.

A nurse from the VA Hospital reported Zachary's call to the Columbus, GA 911 line. She described her call with Zachary this way: "He called, he was extremely upset, that nightmares woke him up, nightmares of killing kids. He was raving. He has slurred speech. He was talking about the kids he killed. . . . And, he does have guns, and presume that they're loaded." The VA nurse also warned the dispatcher that Zachary was suicidal, threatening to kill himself with a gun.

The 911 dispatchers relayed this information to police officers at approximately 3:13 A.M., alerting them that there was a "psychiatric problem" who had "told calltaker that he was having dreams of 7100 [homicide], and advis[ed] he does have a gun in the residence." A firetruck and Emergency Medical Services drove to Zachary's one-level house, followed by Columbus Police Department ("CPD") officers, including Sergeants Hudson and Touchberry and Officer Coats. The officers encountered a large dog tied to the fenced-in front porch.

Between the first police dispatch and Zachary's shooting at 3:41 A.M., the police dispatchers called Zachary's house many times. At first, Zachary threatened the officers, shouting "[y]ou tell these guys in front my door, I'm . . . going to start shooting. I'll start shooting." Later, Zachary answered in a calmer tone: "Nothing

4

wrong, baby. Nothing wrong, I'm fine." Nevertheless, after the 911 dispatchers investigated Zachary in their system, they reported to the officers that he was classified as dangerous.

The officers and dispatchers tried to coax Zachary and his common-law wife, Helen Stephens, out of the house to talk with them. Zachary left the house at least twice, remaining on the porch, shouting, waving his arms wildly, and pacing. He told the officers to leave the property. He lifted his shirt to show the officers that he was unarmed, but he warned the officers that his dog would bite them if they approached.

Stephens left the porch to talk with Sergeant Hudson. She told him that Zachary was unarmed and that she felt safe. She also told the officer that there was a fourteen-year-old child sleeping in the back bedroom. Zachary announced to the officers that "this is over with" and that he was going to bed. He took Stephens by her upper arm and "ushered" her back into the house, shutting the door.

Worried that Zachary would retreat into the house before he could be secured, the officers decided to deploy the beanbag munition to subdue him. Officer Coats positioned himself behind a car about twenty-one feet from the porch with the beanbag gun. Hudson and Touchberry summoned Zachary out of the house. When he emerged, Coats shot Zachary with the beanbag gun. The round

5

hit Zachary in the lower back. He fell onto a couch on the porch. After Zachary tried to push himself up, Coats shot again. The shot ricocheted off of a flower pot on the porch, hitting Zachary in the upper left chest. Zachary fell to the ground. Hudson and Touchberry vaulted themselves over the porch fence and handcuffed Zachary. The officers charged Zachary with making terroristic threats and acts in violation of O.C.G.A. § 16-11-37(a).[1] Although he was able to walk off the porch after the shooting, Zachary sustained serious internal bleeding. He died two days later in the hospital.

C.

Willie L. Glenn, the administrator of Zachary's estate, and Karen Zachary, Lester Zachary's wife, brought this suit in the United States District Court for the Middle District of Georgia, seeking to hold the defendants Hudson, Touchberry, Coats, Bolen, Chief of Police Richard Boren and the City of Columbus liable under 42 U.S.C. § 1983 for violations of Zachary's Fourth Amendment right to be free from an unreasonable seizure and from excessive force. The plaintiffs also asserted violations of the Fourteenth Amendment's Due Process Clause, the First Amendment and Fourteenth Amendment's Equal Protection Clause. Finally, they claimed a civil conspiracy under 42 U.S.C. § 1985 and various torts arising under

---

[1] Under Georgia law, "[a] person commits the offense of a terroristic threat when he or she threatens to commit any crime of violence." O.C.G.A. § 16-11-37(a).

Georgia law.

After discovery, the defendants moved for summary judgment. On December 2, 2008, the district court issued an order, granting the motion for summary judgment for most of the claims, but denying qualified immunity to the officers for the Section 1983 excessive force claims.[2] Glenn v. City of Columbus, Ga., No. 4:07-cv-52 (CDL), 2008 WL 5115032, at *12 (M.D. Ga. Dec. 2, 2008).

In denying the officers qualified immunity, the district court concluded that their use of force was not objectively reasonable under the Fourth Amendment. The court reasoned that the two threats of homicide were mitigated when Zachary appeared to have calmed some and lifted his shirt to show the officers that he was unarmed. Id. The district court also found that there was a jury question about whether Bolen violated Section 1983 in delivering instructions to his officers concerning the use of the beanbag gun. Id. at *14. The officers timely appealed the denial of qualified immunity. Mitchell v. Forsyth, 472 U.S. 511, 528-30 (1985).

II.

The only issue before us in this interlocutory appeal is whether Officers

_____

[2]The district court also denied summary judgment for the following claims: 1) Section 1983 claims against the City of Columbus for excessive force; 2) assault and battery claims against Coats, Hudson, and Touchberry; and 3) intentional infliction of emotional distress claims against Coats, Hudson, and Touchberry. Glenn v. City of Columbus, Ga., No. 4:07-cv-52 (CDL), 2008 WL 5115032, at *20 (M.D. Ga. Dec. 2, 2008).

7

Coats and Bolen and Sergeants Touchberry and Hudson are entitled to qualified immunity. "[Q]ualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." Oliver v. Fiorino, 586 F.3d 898, 904 (11th Cir. 2009) (quoting McCullough v. Antolini, 559 F.3d 1201, 1205 (11th Cir. 2009)). Qualified immunity is intended to protect officials carrying out their discretionary duties from "personal monetary liability and harassing litigation . . . as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." Anderson v. Creighton, 483 U.S. 635, 638 (1987). This protection is broad. "Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized." Malley v. Briggs, 475 U.S. 335, 341 (1986).

Qualified immunity protects officers acting within the scope of their discretionary authority at the time of the incident. McCullough, 559 F.3d at 1205. If the officer was acting within his discretionary authority -- and it is undisputed that Bolen, Hudson, Touchberry, and Coats were -- then the plaintiff has the burden to prove that a reasonable officer would have known that he was violating

8

the Constitution or the laws of the United States.  Id.  To defeat the presumption of qualified immunity, the plaintiff must demonstrate both that the facts, when viewed in a light most favorable to the plaintiff, establish a constitutional violation and that the illegality of the officer's actions was "clearly established" at the time of the incident.  Pearson v. Callahan, 129 S.Ct. 808, 815-16, 818 (2009).  In Pearson, the Supreme Court recently held that we are no longer obliged to conduct the qualified immunity analysis in the sequence set forth in Saucier v. Katz, 533 U.S. 194 (2001).  Accordingly, we may now exercise our discretion to decide which prong of the inquiry to address first.  Pearson, 129 S.Ct. at 818.

In this case, we need not address the first question at all because, even if we were to assume that Zachary's shooting violated the Constitution, the plaintiffs cannot demonstrate that the law was so clearly established as to give the officers fair warning that shooting a beanbag gun at Zachary under these circumstances would have been illegal.  We, therefore, begin and end our analysis with an examination of the second prong.

To prove that the officers violated "clearly established statutory or constitutional rights of which a reasonable person would have known," Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982), the plaintiff may either offer case law from the relevant jurisdictions or show that the right is one of "'obvious clarity'-- i.e.,

9

where the officer's conduct 'lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [the official], notwithstanding the lack of fact-specific case law' on point." Oliver, 586 F.3d at 907 (quoting Vinyard v. Wilson, 311 F.3d 1340, 1355 (11th Cir. 2002)) (alteration in the original).

As for the case law, "we look to the precedent of the Supreme Court of the United States, this Court's precedent, and the pertinent state's supreme court precedent, interpreting and applying the law in similar circumstances." Id.; McClish v. Nugent, 483 F.3d 1231, 1237 (11th Cir. 2007); Marsh v. Butler County, 268 F.3d 1014, 1032 n.10 (11th Cir. 2001) (en banc). Prior cases need not demonstrate the illegality of challenged conduct in the exact factual circumstance. Hope v. Pelzer, 536 U.S. 730, 739 (2002). Rather, the issue is "whether the state of the law [on April 4, 2005] gave respondents fair warning that their alleged treatment of [Zachary] was unconstitutional." Id. at 741; Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1278 (11th Cir. 2004). "This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" McCullough, 559 F.3d at 1205 (quoting Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002)).

"[A] claim of 'excessive force in the course of making [a] . . . 'seizure' of

[the] person . . . [is] properly analyzed under the Fourth Amendment's 'objective reasonableness' standard.'" Scott v. Harris, 550 U.S. 372, 381 (2007) (quoting Graham v. Connor, 490 U.S. 386, 388 (1989)) (alterations in the original); Lee, 284 F.3d at 1197.  When determining whether the force used to effect a seizure is reasonable for Fourth Amendment purposes, a court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests." Graham, 490 U.S. at 396.  We necessarily consider several factors in the calculus, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id.  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id.  This standard allows for an understanding that reasonable officers may incorrectly perceive the seriousness of a threat: "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Id. at 396-97.

To begin with, there is no case in either the United States Supreme Court,

11

the Supreme Court of Georgia, or in the United States Court of Appeals for the Eleventh Circuit that comes close to identifying the illegality of the officers' use of force in these factual circumstances. First, there is no case involving beanbag munitions in any of the relevant courts. The plaintiff principally relies upon the Ninth Circuit's beanbag case, Deorle v. Rutherford, 272 F.3d 1272 (9th Cir. 2001), to establish that the officers violated clearly established law. Despite factual similarities, the California case cannot provide fair warning to the officers in Columbus, Georgia, because, again, in this Circuit, only cases from the pertinent state supreme court, the United States Supreme Court, or the Eleventh Circuit can clearly establish the law.[3]

Nor is there any roughly analogous case law that would suffice to put the officers on notice of the illegality of their conduct in these "tense, uncertain" circumstances. On April 4, 2005, there were no cases in the relevant jurisdictions

---

[3] The case is also factually distinguishable. In Deorle, Officer Rutherford fired a beanbag gun at a psychologically troubled man who had been threatening to commit suicide and had been acting erratically. Deorle v. Rutherford, 272 F.3d 1272, 1275-78 (9th Cir. 2001). Although Deorle had been holding a hatchet, a crossbow, and a can, he had discarded the weapons at the officers' request. Id. at 1276-77. Rutherford shot nevertheless, hitting Deorle in the face, fracturing his skull, and dislodging his left eye. Id. at 1278. Because the threats the officers faced in this case differed substantially from those found in Deorle, the facts give yet another reason why Deorle could not "fairly warn" the officers of a potential constitutional violation in these circumstances. In Deorle, the officers had full view of Deorle throughout the incident and could assess the threat he posed to himself. In sharp contrast, here, the officers feared allowing Zachary to retreat back into the house, where he might have weapons hidden and a child was asleep.

on the use of less than deadly force (here a beanbag munition) to subdue a suspect who had threatened to shoot at officers who were in front of his house, spoke about killing children, and threatened suicide.[4] There were reported cases involving handguns, see, e.g., Carr v. Tatangelo, 338 F.3d 1259 (11th Cir. 2003), and a case involving the use of a Taser gun, see Draper v. Reynolds, 369 F.3d 1270 (11th Cir. 2004), but this weapon (a beanbag gun) lies in the unwashed middle somewhere between deadly force and the use of a Taser gun.

For the clearly established prong, the district court's opinion cites only to Tennessee v. Garner, 471 U.S. 1, 11-12 (1985), for the proposition that "[t]he use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. . . . Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." Id. at

---

[4] The closest factual case involving the use of less than lethal munitions is Mercado v. City of Orlando, 407 F.3d 1152 (11th Cir. 2005), where a panel of this Court held that the officers used excessive force in shooting a baton gun at the head of man threatening to commit suicide. However, the Mercado opinion was issued on April 29, 2005, a few weeks after the incident. It cannot be considered for the purposes of whether the officers' actions were clearly established to be illegal at the time of the shooting. In any case, Mercado is factually distinguishable because the victim in that case "was not committing a crime, resisting arrest, or posing an immediate threat to the officers at the time he was shot in the head." Id. at 1157-58. Here, the officers had probable cause to arrest Zachary for making terroristic threats in violation of O.C.G.A. § 16-11-37(a). The officers also perceived a real threat to the child in the house and to Stephens as well. Finally, it is not at all clear that the use of a baton gun was equivalent to the use of a beanbag munition.

13

11. However, <u>Garner</u> itself held that where the officer "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." <u>Id.</u> When there is "threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." <u>Id.</u> at 11-12.

The district court's reliance on <u>Garner</u> is misplaced. First, <u>Garner</u> is distinguishable, because, instead of merely preventing the "escape" of a non-threatening felon, the officers in this case used force to prevent threatened harm against a child, whom the officers identified as the fourteen-year-old sleeping in the house, against Stephens, or against Zachary himself. Moreover, under <u>Garner</u>'s terms, deadly force may be used when "the suspect poses a threat of serious physical harm, either to the officer or to others." <u>Id.</u> at 11. Here, the officers reasonably believed on the basis of the defendant's threats that he was equipped to commit and had contemplated homicide as well as suicide. Beyond that, and perhaps most importantly, the use of a bean bag munition, unlike a firearm, is not characterized as deadly force. The bean bag was classified by the Columbus Police Department as a Level 6, the highest level use of force below deadly force, and was authorized "when deadly force is not justified, but empty hand control and OC

14

[pepper spray] is not sufficient in effecting an arrest."

The plaintiff also argues that Lundgren v. McDaniel, 814 F.2d 600 (11th Cir. 1987), and Pablo Hernandez v. City of Miami, 302 F.Supp.2d 1373 (S.D. Fla. 2004), clearly establish the law. Again, we are unpersuaded. In Lundgren, where officers shot store owners with a handgun, a panel of this Court held that "shooting a suspected felon who was apparently neither fleeing nor threatening the officers or others . . . clearly violated fourth amendment law." 814 F.2d at 603. In Pablo Hernandez, a district court denied qualified immunity where the officers shot after the suspect had dropped the gun and was fleeing on foot. 302 F. Supp. 2d at 1380-81. But Pablo Hernandez, a district court case, cannot clearly establish the law in this Circuit. Moreover, neither case involved unresolved threats to use deadly force and neither involved the use of a beanbag gun. In short, neither of those gun cases are similar enough to make the "contours of the right . . . sufficiently clear [so] that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987).

In the absence of clearly established case law on point, we are obliged to ask whether the officers' conduct was "so obviously at the very core of what the Fourth Amendment prohibits" that any officer would know it was illegal. See Lee, 284 F.3d at 1199 (concluding "the peculiar facts of this case are 'so far beyond the hazy

15

border between excessive and acceptable force that [the officer] had to know he was violating the Constitution even without caselaw on point'") (quoting Smith v. Mattox, 127 F.3d 1416, 1419 (11th Cir. 1997)); Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 927 (11th Cir. 2000) (concluding that the law was clearly established despite the absence of on-point caselaw when an officer released police dog to attack plaintiff who was subdued on the ground and was not resisting arrest). "This standard is met when every reasonable officer would conclude that the excessive force used was plainly unlawful." Lewis v. City of W. Palm Beach, Fla., 561 F.3d 1288, 1292 (11th Cir. 2009). The instant case does not meet the standard for obvious clarity.

Although, as the district court has noted, the officers received some information that may have mitigated Zachary's threats to shoot himself or the police, the officers also received substantial corroboration that the situation was fraught with grave danger that Zachary would use deadly force. Again, when the officers first received the dispatch call at 3:13 A.M., they were told that Zachary was armed, was dreaming of killing children, and had threatened both suicide and homicide. At 3:17 A.M., Zachary repeated the threats of violence, this time specifically shouting to the 911 dispatcher, "[y]ou tell these guys in front [of] my door, I'm . . . going to start shooting. I'll start shooting." At 3:25 A.M., the 911

16

dispatch added that the 911 database had identified Zachary as dangerous. The officers also recounted that Zachary was ranting, raving, and yelling at them, that he ordered them to leave, that he was believed to possess a loaded firearm, and that he threatened the police that his large dog tied to the front porch would bite them.

At 3:34 A.M., when Stephens told Sergeant Hudson that there was a fourteen-year-old child asleep in the house, the new information increased the palpable fear that there was still another potential victim in the house. Similarly, when Zachary "ushered" Stephens by her upper arm into the house at 3:37 A.M., he gave the officers further reason to fear that deadly force would be used.

Moreover, Zachary's actions on the porch were -- even taking the facts in the light most favorable to the plaintiff -- belligerent and unpredictable. Although Zachary did show his empty waistband, he shouted for the police officers to leave and never came off of the porch. This is not a case where the victim was remotely restrained or compliant. See Lewis, 561 F.3d at 1292. Indeed, this case stands in contrast to those where we have denied qualified immunity to officers who used force once a subject was secured. See, e.g., Vinyard, 311 F.3d at 1348 (denying qualified immunity where an officer used force and pepper spray on a suspect who was "under arrest and secured with handcuffs and in the back seat of the patrol car"); Lee, 284 F.3d at 1200 (denying qualified immunity to an officer who beat

the victim's head against the police car after she was handcuffed); Priester, 208 F.3d at 923-24, 928 (denying qualified immunity to an officer who ordered a dog attack on a defendant who was subdued on the ground).

Ultimately, this is one of those tragic, mistaken cases in the "hazy border between permissible and forbidden force." Smith v. Mattox, 127 F.3d 1416, 1419 (11th Cir. 1997). Quite simply, there was no clearly established law at the time that would have put Officer Coats and Sergeants Hudson and Touchberry on notice that the use of a beanbag munition in these circumstances violated the Fourth Amendment.

The district court's denial of Officer Bolen's claim for qualified immunity likewise fails on the clearly established prong.[5] The case law from the relevant jurisdictions teaches us nothing about safe distances for shooting a beanbag gun. We are also hard pressed to describe this case as one of "obvious clarity."

This is a close case, and where the officers' actions were not clearly established to be unconstitutional, and reasonable officers could disagree, the officers are afforded qualified immunity. Accordingly, we REVERSE and REMAND for proceedings consistent with this opinion.

**REVERSED** and **REMANDED.**

---

[5] Officers facing supervisory liability claims are also entitled to qualified immunity unless the plaintiff proves a violation of a clearly established Constitutional right. See, e.g., Harper v. Lawrence County, Ala., 592 F.3d 1227, 1235-36 (11th Cir. 2010).