# United States Court of Appeals
## For the First Circuit

No. 24-1634

ROBERT P. CONLON, Personal Representative of the Estate of
Michael Conlon; BETSY A. CONLON, Personal Representative of the
Estate of Michael Conlon,

Plaintiffs, Appellants,

v.

FRANCIS SCALTRETO, Officer, Newton Police Department; RICHARD
BENES, Officer, Newton Police Department; GLENN CHISHOLM,
Sergeant, Newton Police Department; DENNIS DOWLING, Captain,
Newton Police Department; CHRISTOPHER MARZILLI, Captain, Newton
Police Department; CITY OF NEWTON,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

Before

Aframe, Lynch, and Howard,
Circuit Judges.

Patrick Driscoll, with whom Janine D. Kutylo, Anthony
Buonopane, and Boyle Shaughnessy Law were on brief, for appellants.
Thomas R. Donohue, with whom Leonard H. Kesten, Francesca M.
Papia, and Brody, Hardoon, Perkins & Kesten, LLP were on brief,
for appellees.

October 22, 2025

**PER CURIAM.**     This appeal arises from a police confrontation that resulted in the fatal shooting of a man in his Newton, Massachusetts apartment building.  The incident began when the Newton Police Department (NPD) received a report that Michael Conlon was attempting an armed robbery of a candy store adjacent to his apartment building.  It ended approximately thirty minutes later when Conlon, who was suffering a mental-health crisis, was shot dead by two officers on scene.

Plaintiffs -- Conlon's parents serving as the representatives of their son's estate -- sued the City of Newton and several of its police officers, asserting claims under 42 U.S.C. § 1983, Title II of the American with Disabilities Act (ADA), the Rehabilitation Act, and Massachusetts law.  The district court dismissed Plaintiffs' complaint entirely and entered judgment.  We vacate the judgment as to Plaintiffs' section 1983 claims against the police officers' use of lethal force and remand the matter for further proceedings on that claim.  The remainder of the judgment is affirmed.

**I.**

**A.**

This appeal follows a Rule 12(b)(6) dismissal of Plaintiffs' First Amended Complaint.  We therefore credit Plaintiffs' account of events from the non-conclusory allegations

- 2 -

in that complaint, drawing all plausible inferences in Plaintiffs' favor. See Penate v. Hanchett, 944 F.3d 358, 362 (1st Cir. 2019).

At approximately 1:45 p.m. on January 5, 2021, NPD Officer Zachary Raymond responded to a report of an ongoing armed robbery at Indulge!, a candy store located at 16 Lincoln Street in Newton, Massachusetts. When Raymond arrived, he saw Michael Conlon standing outside the store holding a small kitchen knife.[1] Raymond drew his sidearm and ordered Conlon to drop the knife. Conlon, a twenty-eight-year-old man suffering from a mental illness that made him fear the police, responded by fleeing into his three-story apartment building next door.

With Officer Raymond in pursuit, Conlon ascended two flights of stairs to the third and top floor. Once there, Conlon turned towards Raymond, held the kitchen knife against his own neck, and threatened to cut his own throat if Raymond advanced. Raymond retreated to the second-floor landing to await backup. Conlon then used the butt of the knife to knock on Apartment 3's door, asking repeatedly to speak with a neighbor who was not home at the time.

Meanwhile, several members of NPD and the Massachusetts State Police (MSP) arrived, including NPD Captains Dennis Dowling and Christopher Marzilli. Dowling and Marzilli observed Conlon

---

[1] The First Amended Complaint does not provide additional detail about the "kitchen knife."

standing in front of the entryway to Apartment 3, which was located at the top of the stairs on the third-floor landing. Conlon was spitting and drooling as he expressed his belief that he was participating in a simulation and questioned whether the officers assembling before him were "real." Dowling and Marzilli recognized that Conlon was suffering a mental-health crisis and an NPD social worker was called to the scene.

Additional officers continued to arrive and assemble. NPD Officer Francis Scaltreto assumed principal responsibility for negotiating with Conlon. To do so, Scaltreto stood approximately twelve feet from Conlon in the third-floor hallway. While Scaltreto spoke to Conlon, either Captain Dowling or Captain Marzilli instructed NPD Sergeant Glenn Chisholm to retrieve Chisholm's "beanbag shotgun" -- a usually less-than-lethal weapon -- and stand in the open doorway of Apartment 4 alongside NPD Officer Richard Benes. Two MSP troopers flanked Chisholm and Benes near the doorway to Apartment 4 and another four NPD officers waited inside that apartment. An NPD lieutenant carrying a shield waited at the bottom of the stairwell below Conlon.

After the police gained access to the back entrance of the building, officers used Apartment 4 as a "staging area." The entryway to Apartment 4 was approximately twenty feet down the hall from where Conlon stood outside Apartment 3. Officers also barricaded the rear door to Apartment 3 so that Conlon could not

- 4 -

escape through that unit. As officers continued to arrive on scene, Captain Marzilli informed them that Conlon was a "psych patient" and characterized the situation as "a mental health issue."

The assembled group included an NPD officer who had responded with NPD social worker Sarah Eknanian, who remained in a police car parked outside the apartment building. Separately, an NPD lieutenant on scene contacted the Northeastern Massachusetts Law Enforcement Council (the "Council") to request assistance from a negotiator and the Council's tactical team. Council members are trained in de-escalating and negotiating techniques for mentally-ill or suicidal persons and typically require about thirty minutes to respond to an incident in Newton.

Captains Dowling and Marzilli agreed that they should try to wait to apprehend Conlon until after the Council team arrived, but that Conlon could be incapacitated by Sergeant Chisholm using the beanbag shotgun if the situation deteriorated. In that event, Dowling and Marzilli agreed that two MSP troopers should back up Chisholm using tasers and, if non-lethal measures proved ineffective, Officer Benes should use his sidearm to employ lethal force. Dowling and Marzilli communicated this plan to the officers. Though Marzilli, Chisholm, and Benes endorsed the approach, the MSP troopers expressed doubts that their tasers would be effective because Conlon was wearing thick winter clothing.

In the meantime, Officer Scaltreto continued to negotiate with Conlon from the narrow, third-floor hallway, standing approximately twelve feet from Conlon. Conlon, still agitated, held the kitchen knife in one hand and a fire extinguisher in his other. Conlon maintained that he was participating in a simulation and repeatedly asked to speak with his father. Several officers feigned belief in Conlon's delusions and said they would call his father if he dropped the knife. After approximately twenty minutes of negotiation, Scaltreto convinced Conlon to drop the knife and fire extinguisher to the floor. He did so by telling Conlon that the "simulation" required Conlon to release the knife before the police could contact his father. Officers had also assured Conlon that he would not be harmed.

Once Conlon dropped the knife, Officer Scaltreto communicated to the officers behind him that there was an "opening." Captain Marzilli heard this message and relayed it to Captain Dowling. After Dowling received Marzilli's message, Dowling radioed Sergeant Chisholm to use the beanbag shotgun on Conlon. Marzilli provided Chisholm with confirmation to carry out the order.

Still standing about twelve feet from Conlon, Sergeant Chisholm raised the beanbag shotgun and pointed it at Conlon's collarbone. While pointing the beanbag shotgun, Chisholm pulled the trigger. The gun did not fire, however, and instead made a

loud clicking noise. Chisholm then attempted to "clear" the beanbag shotgun by discharging a round but was unable to do so. Based on accounts from some but not all officers, Conlon reacted by picking up the knife and moving towards Chisholm.[2] An MSP trooper then deployed his taser at Conlon and, nearly simultaneously, Officers Benes and Scaltreto fired their sidearms, killing Conlon. The Council team arrived six minutes later. An autopsy showed that Conlon suffered fatal gunshot wounds to the head, neck, and torso.

**B.**

Plaintiffs sued the City of Newton and several NPD officers involved in the fatal shooting -- namely, Officers Scaltreto and Benes, Sergeant Chisholm, and Captains Dowling and Marzilli (collectively, the "Officer-Defendants"). As relevant to this appeal, Plaintiffs asserted claims against the Officer-Defendants under section 1983 and the Massachusetts Civil Rights Act ("MCRA") alleging use of excessive force (Counts 1 and 8), and for wrongful death under the Massachusetts Wrongful Death Act (Count 9). Plaintiffs also brought a state-law claim against Chisholm for common law assault (Count 10). Plaintiffs alleged that the City likewise violated section 1983 by failing to train

---

[2] As described in greater detail infra, officers are alleged to have provided "inconsistent statements" regarding, inter alia, "whether [Conlon] picked up the knife after the [beanbag] shotgun was fired."

- 7 -

and supervise its officers on responding appropriately to mental-health emergencies and the use of beanbag shotguns (Count 2) and further violated the ADA and the Rehabilitation Act by failing to accommodate Conlon's disability and adequately train its officers (Counts 4-6).

The Officer-Defendants and the City moved to dismiss all claims for failure to state a claim upon which relief could be granted, which included assertions that the Officer-Defendants were protected by qualified immunity. Fed. R. Civ. P. 12(b)(6). The district court granted the motion in full.

On appeal, Plaintiffs seek to reverse the district court's decision with respect to their Fourth Amendment excessive force claim against the Officer-Defendants, the section 1983 claim against the City, the entirely separate claims under the ADA and Rehabilitation Act, and the claims under Massachusetts state law. But their opening brief does not develop any meaningful challenge to the dismissal of their claims against the Officer-Defendants for common law assault or wrongful death under the Massachusetts Wrongful Death Act, nor do they respond to the arguments made by the Officer-Defendants as to those two claims on reply. We accordingly deem waived any claim of error arising out of the dismissal of Counts 9 or 10. See Schneider v. Loc. 103 I.B.E.W. Health Plan, 442 F.3d 1, 3 (1st Cir. 2006) ("It is well-established that 'issues adverted to in a perfunctory manner, unaccompanied by

some effort at developed argumentation, are deemed waived.'" (quoting Nikijuluw v. Gonzales, 427 F.3d 115, 120 n.3 (1st Cir. 2005))).

We therefore limit our analyses to only the issues raised with respect to the remaining claims, which are narrower than those raised in the district court. For the reasons that follow, we affirm dismissal of the claims against the City and the MCRA claim against the Officer-Defendants, and remand for further proceedings on Plaintiffs' excessive force claim against the Officer-Defendants as it pertains to Conlon's fatal shooting.

## II.

We review de novo the grant of a motion to dismiss under Rule 12(b)(6). See Guadalupe-Báez v. Pesquera, 819 F.3d 509, 514 (1st Cir. 2016) (citing Medina-Velázquez v. Hernández-Gregorat, 767 F.3d 103, 108 (1st Cir. 2014)). To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim for relief that is plausible on its face. See Pike v. Budd, 133 F.4th 74, 82 (1st Cir. 2025) (citing Ashcroft v. Iqbal, 556 U.S. 662, 671 (2009)). A claim is facially plausible when the pleaded facts permit "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Iqbal, 556 U.S. at 678). We first consider whether the various claims in the First Amended Complaint state plausible claims

against the Officer-Defendants.  Then we separately address the claims against the City.

## III.

We begin with Plaintiffs' section 1983 claim against the Officer-Defendants for their alleged uses of excessive force in violation of the Fourth Amendment.  Section 1983 supplies a private right of action against any person who, under color of state law, deprives another of "any rights, privileges, or immunities secured by the Constitution and [federal] laws."  42 U.S.C. § 1983.  A section 1983 claim may be based on a police officer's use of excessive force in effecting an arrest because the Fourth Amendment protects, among other things, an individual's right to be free from unreasonable seizures by the police.  See Stamps v. City of Framingham, 813 F.3d 27, 35 (1st Cir. 2016).  "To make out a Fourth Amendment excessive force claim, a plaintiff must show, as an initial matter, that there was a seizure within the meaning of the Fourth Amendment and then that the seizure was unreasonable."  Id.

On appeal, Plaintiffs challenge dismissal of their section 1983 claim against the Officer-Defendants based upon two uses of allegedly excessive force against Conlon: (1) the deployment of the beanbag shotgun (i.e., the nearly simultaneous pointing and misfiring of the weapon); and (2) the fatal shooting. The Officer-Defendants do not contest that Plaintiffs have adequately pleaded that Conlon was "seized" for Fourth Amendment

- 10 -

purposes by both actions. Instead, the Officer-Defendants have chosen to defend against these section 1983 excessive force claims on the grounds that they are entitled to federal qualified immunity.

Qualified immunity protects government officials "when [they] make a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances [they] confronted." Taylor v. Riojas, 592 U.S. 7, 8 (2020) (quoting Brosseau v. Haugen, 543 U.S. 194, 198 (2004)). The defense shields an officer from a section 1983 claim unless the officer (1) "violated a federal statutory or constitutional right"; and (2) "the unlawfulness of [the officer's'] conduct was 'clearly established at the time'" of the alleged misconduct. Lachance v. Town of Charlton, 990 F.3d 14, 20 (1st Cir. 2021) (quoting Irish v. Fowler, 979 F.3d 65, 73 (1st Cir. 2020)). We further break down the second stage of the inquiry by asking whether (a) there is "controlling authority or a consensus of persuasive authority sufficient to put an officer on notice that his conduct fell short of the constitutional norm"; and (b) an objectively reasonable officer would have known that his conduct violated" the clearly established law in the circumstances he faced. Est. of Rahim v. Doe, 51 F.4th 402, 410 (1st Cir. 2022) (quoting Conlogue v. Hamilton, 906 F.3d 150, 155 (1st Cir. 2018)).

Under the second step of the second prong, "an officer is entitled to qualified immunity '[i]f . . . an objectively reasonable officer could have concluded (even mistakenly) that his or her conduct did not violate [the plaintiffs'] rights.'" Johnson v. City of Biddeford, 92 F.4th 367, 375 (1st Cir. 2024) (quoting Stamps, 813 F.3d at 34 n.7). "Reasonableness is assessed 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,' and must take account of 'the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation.'" Bannon v. Godin, 99 F.4th 63, 78 (1st Cir. 2024) (quoting Graham v. Connor, 490 U.S. 386, 396-97 (1989)), cert. denied, 145 S. Ct. 1048 (2025). We affirm the district court's decision to grant the officers qualified immunity as to use of the beanbag gun because we cannot say no reasonable officer, in the context of the facts here, would have understood that his actions were in violation of the Fourth Amendment.

## A.

We start with whether the district court erred in granting qualified immunity to the asserted claims of excessive force as to Sergeant Chisholm's deployment of the beanbag shotgun at Captains Dowling and Marzilli's instruction. We hold that the district court did not err because under the second step of the

second prong of the qualified immunity analysis, an objectively reasonable officer would not have known that his conduct violated the clearly established law in the circumstances he faced. We operate from the assumption, not challenged by the defendants, that the beanbag excessive force claim is both an independent claim and is plausible.

We affirm the district court's grant of qualified immunity because it would not have been clear to a reasonable officer that aiming the usually less-than-lethal beanbag gun at Conlon's breastbone and attempting to fire it constituted excessive force, or at least not so clear that "no competent officer could have thought that [it] was permissible." Penate, 73 F.4th at 22 (quoting Mlodzinski v. Lewis, 648 F.3d 24 (1st Cir. 2011)).[3] The officers had reason to think the firing of the beanbag

---

[3] As to the first part of the second prong, we note there is no controlling First Circuit or Supreme Court case giving notice to the officers that such deployment would violate Conlon's Fourth Amendment rights. And we see no consensus of persuasive authority from other circuits giving such notice. Indeed, a number of courts have found to the contrary. See Bell v. Irwin, 321 F.3d 637, 639-40 (7th Cir. 2003) (no use of excessive force when officers shot suicidal, knife-armed man with beanbag gun after failed negotiations and as he leaned toward propane tank with cigarette lighter); Cortesluna v. Leon, 979 F.3d 645, 652-53 (9th Cir. 2020) (no use of excessive force when officer shot plaintiff twice with a beanbag shotgun in response to a domestic violence incident, where subject had knife in his pocket), cert. granted, decision rev'd sub nom. Rivas-Villegas v. Cortesluna, 595 U.S. 1 (2021), and adhered to in part, 22 F.4th 866 (9th Cir. 2022); Glenn v. City of Columbus, 375 F. App'x 928 (11th Cir. 2010) (unpublished) (officer was entitled to qualified immunity when he deployed beanbag gun from twenty-one feet away against an unarmed individual experiencing a mental-health crisis and who had access to guns).

gun would not be lethal. Officer Chisholm fired it from a distance of about twelve feet, aimed for the breastbone, not the head or the heart, and had observed that Conlon was protected by thick layers of winter clothing. Those layers meant to the officers that the use of tasers would likely be ineffective. And that realization meant the officers were in compliance with the NPD policy on the use of beanbag guns, as the lesser force of a taser would not work. NPD's General Order 301 authorizes use of a beanbag gun to "stop a suspect through blunt, non-lethal force" when "[t]he officer's attempt to gain lawful compliance has culminated in a perceived or actual attack on the officer or others," but the "officer makes the reasonable assessment that such actions by the subject would not result in the officers [sic] or other's death or serious bodily harm." Under General Order 301, officers may deploy the beanbag gun "when necessary to preserve the peace, prevent crimes, [or] to prevent suicide or self-inflicted injury," or when "necessary to overcome resistance to lawful arrests, searches and seizures, and to prevent escape from custody." Here, the officers could reasonably have concluded that the beanbag gun was an appropriate option under General Order 301 because Conlon had access to both a knife and fire extinguisher, had refused to comply with officers for over twenty minutes, and had threatened to cut his own throat.

Beyond that, the officers had reason to seek further de-escalation. Conlon remained a threat. Although Conlon had put down the knife, it was at his feet and he could easily pick it up again (as he did when the gun was fired unsuccessfully). The knife continued to be a lethal threat both to Officer Scaltreto, who was only twelve feet away standing in a narrow hallway, and to the other officers about twenty feet away. See Rahim, 51 F.4th at 417 (officers were entitled to qualified immunity when they deployed lethal force against subject armed with knife who came within twenty-five feet).

Because the officers could reasonably perceive that Conlon remained volatile and a threat, this situation is distinguishable from instances where we have found that officers unjustifiably escalated the use of force. Raiche v. Pietroski, 623 F.3d 30 (1st Cir. 2010), cited by Conlon and the dissent, is inapposite because there the plaintiff "present[ed] no indications of dangerousness" at the time the officers deployed force. Id. at 39. Similarly, in Jennings v. Jones, 499 F.3d 2 (1st Cir. 2007), the subject had been fully restrained, had stopped resisting, and had warned officers of his ankle pain before they nevertheless applied additional unnecessary force. See id. at 18. By contrast, here Conlon remained in a tense situation in close proximity to the officers, who could reasonably perceive a continuing threat. See Est. of Bennett v. Wainwright, 548 F.3d 155, 175-76 (1st Cir.

- 15 -

2008) (holding that officers were entitled to qualified immunity on excessive force claim because they reasonably but mistakenly could have believed that decedent posed continuing, imminent threat).

We hold that a reasonable officer would have understood that use of the beanbag gun most likely would de-escalate the situation further. The officer would most likely have concluded that use of the beanbag gun would reduce the need for use of further force and reduce the risk to all in the encounter, both the police officers and Conlon. It would not be objectively foreseeable to a reasonable officer in Sergeant Chisholm's position, acting pursuant to his superior's instructions, that the beanbag gun would not function properly, much less that the attempted deployment would lead to Conlon allegedly picking up the knife again. Nothing in the pleadings asserts that the officers should have known either of these points.

**B.**

We consider next whether Plaintiffs have pleaded sufficient facts to overcome qualified immunity for an excessive force claim based on the fatal shots fired by Officers Benes and Scaltreto. As noted above, the shooting took place after the failed efforts to incapacitate Conlon using the beanbag gun.

In dismissing Plaintiffs' section 1983 claim based on this conduct, the district court recognized that the First Amended

Complaint leaves open "myriad factual questions surrounding the critical moments before the shooting," including "how rapidly Conlon approached," "whether [Conlon] held the knife as if to strike [Sergeant] Chisholm," "whether a warning was given before the fatal shots were fired," and "how much time elapsed between the attempted use of the [beanbag] shotgun and the shooting itself." But the court read the First Amended Complaint to concede the truth of the key fact on which the Officer-Defendants rest their immunity defense: that Conlon was armed with a knife when he advanced towards Sergeant Chisholm. From there, the court concluded that the Officer-Defendants were entitled to qualified immunity because Plaintiffs failed to identify authority that would support finding a Fourth Amendment violation "when officers use deadly force in response to an advancing suspect in a mental-health emergency who is armed with a knife."

On appeal, the Officer-Defendants likewise assume that Conlon was advancing on Chisholm with a knife and do not argue that the Officer-Defendants would be entitled to qualified immunity if Conlon had been unarmed at the time of the shooting or not able to inflict injury on officers or had clearly indicated Conlon had no intent to injure anyone, but possibly himself. That is for good reason: "[a] police officer's use of deadly force is deemed a seizure under the Fourth Amendment, and such an extreme action is reasonable (and, therefore, constitutional) only when

'at a minimum, a suspect poses an immediate threat to police officers or civilians.'" McKenney v. Mangino, 873 F.3d 75, 81 (1st Cir. 2017) (quoting Jarrett v. Town of Yarmouth, 331 F.3d 140, 149 (1st Cir. 2003)); see also Bennett, 548 F.3d at 175 (noting deadly force is justified only where "an individual posed a 'threat of serious physical harm either to the officer or others'" (quoting Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 23 (1st Cir. 2005))). Accordingly, we have held that employing lethal force against a decedent who, during a mental-health emergency, slowly approached an officer and a civilian while holding a firearm lowered at his side "offended clearly established Fourth Amendment law," and that "an objectively reasonable officer would have realized as much." McKenney, 873 F.3d at 74.

It follows that the Officer-Defendants' entitlement to qualified immunity may well hinge on whether Conlon was armed when Officers Benes and Scaltreto used lethal force against him. It is true that Plaintiffs' first complaint asserts at one point that the misfiring of the beanbag shotgun "caus[ed] a loud clicking noise which startled [Conlon] and caused him to pick up the kitchen knife he had just dropped pursuant to [Officer] Scaltreto's orders." Plaintiffs proceed, however, to qualify that account of events in two respects. First, they plead that Conlon is only "alleged[]" to have "reacted" to the attempted use of the beanbag shotgun "by picking up the kitchen knife and moving towards

- 18 -

[Sergeant] Chisholm." Second, they allege that the Officer-Defendants gave "inconsistent statements" after the incident about "where and when officers were positioned, what [Conlon] was doing when he stood in the hallway, and critically, whether [Conlon] picked up the knife after the bean[]bag shotgun was fired." Plaintiffs note also that the Officer-Defendants have not been able to substantiate their claim that Conlon rearmed himself with a knife through "photographic evidence" and assert that "conflicting testimony" was provided on "whether the knife was near [Conlon] when he was killed."

As we read the complaint, Plaintiff pleads that there are material facts to dispute as to several occurrences in the moments before the fatal shooting. The uncertain "nature of the complaint and the record at this early stage of litigation makes vacating the appropriate course." Irish v. Maine, 849 F.3d 521, 526 (1st Cir. 2017); see also Rahim, 51 F.4th at 410 (in determining whether officers are entitled to qualified immunity, courts consider, among other factors, "[w]hether the suspect was advancing on the officers or otherwise escalating the situation"). Discovery may reveal that Conlon picked up the knife in the moments preceding his death; it may also reveal that he charged unarmed towards Sergeant Chisholm; or it may even reveal that Conlon did not charge at all. The resolution of the precise sequence of events leading up to Conlon's death is clearly relevant to

determining whether qualified immunity applies. But we cannot resolve the qualified immunity question presently presented without a fuller development of the record. See Irish, 849 F.3d at 528. We accordingly vacate the district court's dismissal of Plaintiffs' section 1983 claim against the Officer-Defendants' use of lethal force to permit the needed discovery.

**IV.**

We turn next to the remaining count against the Officer-Defendants pressed by Plaintiffs on appeal: Plaintiffs' MCRA claim based on the Officer-Defendants' alleged use of excessive force against Conlon. The MCRA is "a state-law analogue" to section 1983 "that provides a statutory civil cause of action against those who 'interfere' with the exercise or enjoyment of rights secured by federal or state law." Nolan v. CN8, 656 F.3d 71, 76 (1st Cir. 2011) (quoting Mass. Gen. Laws ch. 12, § 11H)). But "the MCRA is narrower than [section] 1983 in that it limits its remedy to conduct that interferes with a secured right 'by threats, intimidation or coercion.'" Id.

The Massachusetts Supreme Judicial Court held in Longval v. Comm'r of Corrs., 404 Mass. 325 (1989), that "[a] direct violation of a person's rights does not by itself involve threats, intimidation, or coercion and thus does not implicate the [MCRA]." Id. at 333. Since that decision, courts have interpreted this limitation to require "proof of 'threats, intimidation, or

- 20 -

coercion' . . . in addition to the interference with the exercise or enjoyment of secured rights." Sarvis v. Bos. Safe Deposit & Tr. Co., 711 N.E.2d 911, 918 (Mass. App. Ct. 1999) (emphasis added). The district court accordingly dismissed Plaintiffs' MCRA claim, noting that "[a]llegations of excessive force, without more, consistently have been held not to constitute violations of the MCRA." (citing Farrah ex rel. Est. of Santana v. Gondella, 725 F. Supp. 2d 238, 248 (D. Mass. 2010) (entering judgment for officer-defendants on MCRA claim based on alleged use of excessive force on the ground that plaintiff failed to plead "that the [Fourth Amendment] violation was intended to coerce [the arrestee] into refraining from the exercise of a right or privilege secured by law" because "[t]here is no right under state or federal law to resist an arrest . . . even one that is illegal from its inception); Gallagher v. Commonwealth, No. Civ.A. 00-11859-RWZ, 2002 WL 924243, at *3 (D. Mass. Mar. 11, 2002) (noting that the "use of force is not, in itself, 'coercive' within the meaning of the [MCRA] unless such force is inflicted in order to achieve 'some other purpose'" (quoting Longval, 404 Mass. at 333))).

On appeal, Plaintiffs argue that the Officer-Defendants' conduct in deploying the beanbag shotgun against Conlon constituted a threat or coercion under the MCRA. Even assuming dubitante that is so, however, Plaintiffs plead no facts showing how such conduct caused Conlon to give up some additional right,

as required by Massachusetts law.  See Sarvis, 711 N.E.2d at 918. We accordingly affirm the dismissal of Plaintiffs' MCRA claim.

**V.**

We now turn to Plaintiffs' claims against the City. These claims fall into two groups: (1) claims arising from the City's alleged failure to train officers, in violation of section 1983 and, separately, in violation of the ADA; and (2) claims arising from the City's alleged failure to accommodate Conlon, in violation of the ADA and the Rehabilitation Act.  For the reasons set forth below, we conclude that these claims were properly dismissed.

**A.**

We begin by examining Plaintiffs' failure-to-train claim against the City under section 1983.  Though a municipality may not be held vicariously liable under section 1983 for the acts of its employees, see Monell v. Dep't of Soc. Servs., 436 U.S. 658, 692 (1978), a municipality may be liable only under certain circumstances where its failure to train or supervise those employees results in a constitutional injury, see City of Canton v. Harris, 489 U.S. 378, 388 (1989).  Establishing municipal liability for a failure to train or supervise -- referred to as a Monell claim -- requires a three-part showing that (1) the action in question constituted a "policy" or "custom" attributable to the municipality, Young, 404 F.3d at 26; (2) the policy or custom

- 22 -

"actually caused" the constitutional injury, id.; and (3) the municipality acted with a degree of fault that amounts to "deliberate indifference to the rights of persons with whom the police come into contact," City of Canton, 489 U.S. at 388-89.

The deliberate indifference standard for imposing liability on a municipality is "stringent." Cosenza v. City of Worcester, 120 F.4th 30, 38 (1st Cir. 2024) (quoting Bannon, 99 F.4th at 88). "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city," nor "will it suffice to prove that an injury or accident could have been avoided if an officer had better or more training, sufficient to equip him to avoid the particular injury-causing conduct." City of Canton, 489 U.S. at 390-91. Rather, satisfying this standard typically requires demonstrating that policymakers were aware of, and acquiesced in, "a pattern of similar constitutional violations by untrained employees." Cosenza, 120 F.4th at 38 (quoting Connick v. Thompson, 563 U.S. 51, 62 (2011)). Municipal liability can attach following a single constitutional injury only in "a narrow range of circumstances" in which the plaintiff can establish that a constitutional violation was a "highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." Young, 404 F.3d at 25-26.

Here, Plaintiffs premise their Monell claim on a single incident -- the fatal shooting of Conlon -- and the complaint does not identify any prior "similar constitutional violations" by untrained police officers that would have put the City on notice of any deficiency in its training program. Cosenza, 120 F.4th at 38. The district court thus dismissed the claim on the ground that Plaintiffs failed to allege that the City acted with deliberate indifference.

On appeal, Plaintiffs argue that the need to train and supervise officers on "the use of deadly force including the use of beanbag shotguns" and "responding to persons with mental illness" was "so obvious as to constitute deliberate indifference to Conlon's constitutional rights." In other words, Plaintiffs argue they have adequately alleged a Monell claim on a single-incident theory for the City's failure to adequately train officers on these two topics.

But the complaint has not pleaded any facts to support this contention, as it must do. The complaint does not contain any factual allegations about the substance or extent of training that NPD officers did receive. Nor do its factual allegations give rise to a plausible inference that the need for training to avoid incidents like that which transpired here was "so patently obvious" that any failure to provide such training would have amounted to deliberate indifference. Connick, 563 U.S. at 62.

If anything, Plaintiffs' contention that the Officer-Defendants had never fired a beanbag shotgun "in an active situation" prior to the incident in question undermines the notion that the need for more or better training on the weapon should have been evident to the City. See City of Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985) (holding that a single shooting incident is insufficient to establish municipal liability for inadequate police training). In the same vein, the Officer-Defendants' decision to call upon specialized resources that the City makes available for responding to mental-health emergencies, including by requesting assistance from the Council and the full-time NPD social worker, certainly suggests that the City provides at least some training on addressing situations resulting from mental health issues. Indeed, Plaintiffs expressly allege as much by pleading that "NPD training on how to respond to someone with mental . . . illness is minimal." "The fact that training is imperfect or not in the precise form a plaintiff would prefer is insufficient" to show deliberate indifference. Young, 404 F.3d at 27. We therefore affirm the district court's dismissal of Plaintiffs' Monell claim against the City.

We hold the same with respect to Plaintiffs' failure-to-train claim against the City under Title II of the ADA. 42 U.S.C. § 12132. As the district court noted, it is an open question in this Court whether Title II of the ADA requires a

- 25 -

police department "to draft policies and train officers on the needs of the mentally ill public." Buchanan v. Maine, 469 F.3d 158, 177 (1st Cir. 2006). However, where the police department "did in fact have such policies and training," we have held that a plaintiff cannot maintain a viable ADA claim by alleging that such policies and training are inadequate. Id. (holding that plaintiff could not maintain an ADA failure-to-train claim based on a theory "that police training, which was provided, was insufficient"). Because that is Plaintiffs' allegation here, the district court properly dismissed this claim.

**B.**

Finally, we address Plaintiffs' claims against the City under the ADA and the Rehabilitation Act for allegedly failing to accommodate Conlon's disability. Plaintiffs' argument as to the dismissal of the Title II claim is that the police officers, knowing Conlon suffered a disability in the form of his mental illness, failed to reasonably accommodate that disability.

In favor of Plaintiffs, we make three assumptions arguendo:

(1) We assume that a Title II ADA claim can be asserted for events during the arrest of a suspect based on probable cause before the scene has been secured. But see Hainze v. Richards, 207 F.3d 795 (5th Cir. 2000); Rubin v. De La Cruz, No. 24-20015,

2025 WL 764603, at *3-4 (5th Cir. Mar. 11, 2025) (reinforcing Hainze).[4]

(2) While we agree that the individual line officers cannot be held liable for damages under Title II, and we agree with Chief Judge Sutton's analysis in Jones v. City of Detroit, 20 F.4th 1117 (6th Cir. 2021), that the municipality itself cannot be held vicariously liable for its officers' actions under Title II, we assume without deciding that the "public entity" element of Title II does not preclude claims brought against relatively high-level officers of the City -- in this case, Captains Marzilli and Dowling. But see Gohier v. Enright, 186 F.3d 1216 (10th Cir. 1999)(affirming district court's denial of motion to amend complaint to add a claim under the ADA where officers used force against individual in self-defense and complaint did not allege a reasonable-accommodation theory).

(3) We assume that Conlon was a "qualified individual" as further defined in the text of Title II. See 42 U.S.C. § 12131(2) (defining a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements for the receipt of services or

---

[4] The issue was raised but not resolved in the Supreme Court case of City and County of San Francisco v. Sheehan, 575 U.S. 600 (2015). See id. at 610.

the participation in programs or activities provided by a public entity"); cf. Buchanan, 469 F.3d at 163, 171 (finding it undisputed that plaintiff was a "qualified individual" when he suffered from mental health challenges that included schizophrenia).

Even with these assumptions, the pleadings do not state a Title II failure-to-accommodate claim. If Title II imposed any duty in this situation, it was to make a "reasonable accommodation." The reasonableness of any accommodation necessarily takes account of both the context and the facts and circumstances known to the officers when they acted. See Sheehan v. City and County of San Francisco, 743 F.3d 1211, 1232 (9th Cir. 2014) ("[C]ircumstances inform the reasonableness analysis under the ADA, just as they inform the distinct reasonableness analysis under the Fourth Amendment."), rev'd in part, cert. dismissed in part sub nom. City and County of San Francisco v. Sheehan, 575 U.S. 600, 610; Bahl v. County of Ramsey, 695 F.3d 778, 784 (8th Cir. 2012) (noting that "[e]ven if the ADA applied to [a] traffic stop," the defendant-officer was not required to accommodate the plaintiff's disability during the traffic stop); Roell v. Hamilton County, 870 F.3d 471, 489 (6th Cir. 2017) ("In the context . . . surrounding Roell's arrest, . . . Roell cannot make out a viable ADA claim under her failure-to-accommodate theory."); Bircoll v. Miami-Dade County, 480 F.3d 1072, 1085 (11th Cir. 2007) (noting that the circumstances "presented by criminal activity and the

already onerous tasks of police on the scene go . . . to the reasonableness of the requested ADA modification").[5]

Nothing in the pleadings makes it plausible that the Officer-Defendants reacted to Conlon as they did "by reason of his disability." Further, nothing in the pleadings provides a basis for holding that any of the officers on scene were on notice of a reasonable accommodation that would be necessary to prevent discrimination. Nor do they establish a plausible Title II case that Conlon was denied access to the City's "services, courses, or activities" in the course of the officers' attempt to arrest him. In short, there is no plausible claim that the officers discriminated against Conlon on the basis of his mental health disability. See Buchanan, 469 F.3d at 175 (affirming summary judgment in favor of Maine on Title II claim where plaintiff could not identify specific services that the state should have but failed to provide to plaintiff); King v. Hendricks County Comm'rs, 954 F.3d 981, 989 (7th Cir. 2020) (affirming police officer did not violate Title II where court was "given no reason to believe that [the officer's] response would have been different had someone not suffering from a mental illness done the same thing" and

---

[5]     The Fourth Amendment issues and the ADA issues require distinct analyses. See Gray v. Cummings, 917 F.3d 1 (1st Cir. 2019) (analyzing Title II liability separately from the reasonableness of an officer's use of force under the Fourth Amendment).

plaintiff did not propose anything that the officer "should have done differently to accommodate the decedent's mental illness"); De Boise v. Taser Int'l, Inc., 760 F.3d 892, 899 (8th Cir. 2014) (finding officers did not violate Title II "[d]ue to the unexpected and rapidly evolving circumstances" of encounter where officers observed individual's "aggressive and irrational behavior and his continued non-compliance with their demands").

Lastly, because "[t]he same standards . . . apply to claims under the ADA and under the Rehabilitation Act," Calero-Cerezo v. U.S. Dep't of Just., 355 F.3d 6, 11 n.1 (1st Cir. 2004), we also affirm dismissal of Plaintiffs' claims against the City under the Rehabilitation Act.

## VI.

For the reasons described, we **vacate** the judgment on Plaintiffs' claims against Officer-Defendants for the use of excessive force in violation of 42 U.S.C. § 1983 (Count 1) as it relates to the fatal shooting and **remand** the matter for further proceedings on that claim. The remainder of the judgment is **affirmed**. The parties shall bear their own costs.

**So ordered**.

**- Dissenting Opinion Follows -**

**AFRAME**, <u>Circuit Judge</u>, <u>dissenting in part</u>.  I agree with all aspects of the majority opinion save one.  I would permit discovery on the plaintiffs' section 1983 claim based on Sergeant Chisholm's deployment of the beanbag shotgun against Conlon.

To bring a section 1983 claim, the plaintiffs must establish that the officer is not immune from such suits.  <u>See</u> <u>Lachance</u> v. <u>Town of Charlton</u>, 990 F.3d 14, 20 (1st Cir. 2021). This requires a two-part inquiry: (1) was the officer's use of force a violation of the Fourth Amendment, and (2) if so, was the unlawfulness of the officer's conduct clearly established when the officer acted.  <u>See id.</u>  Based on the complaint's allegations, the majority concludes that Sergeant Chisholm is entitled to qualified immunity because, even assuming that the allegations about the beanbag shotgun constitute a separate Fourth Amendment claim and that these allegations, if true, constitute a violation of Conlon's rights, the unlawfulness of Chisholm's conduct was not clearly established when he acted.  In my view, the complaint's allegations satisfy both parts of the inquiry:  Chisholm violated Conlon's Fourth Amendment rights by firing the beanbag shotgun at him, and the unlawfulness of that conduct was clearly established when the incident occurred.

A.    <u>Fourth Amendment Violation</u>

An officer violates the Fourth Amendment by using force to effect a particular seizure that is unreasonable under the

- 31 -

circumstances. See Graham v. Connor, 490 U.S. 386, 396 (1989).

Whether an officer's conduct is unreasonable "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Id. (quoting Tennessee v. Garner, 471 U.S. 1, 8 (1985)). Assessments of reasonableness "must be judged from the perspective of a reasonable officer on the scene." Id.

I begin by evaluating "the nature and quality" of Sergeant Chisholm's intrusion on Conlon's Fourth Amendment interests. Specifically, I consider the degree of force that Chisholm allegedly attempted to apply by firing the beanbag shotgun at Conlon's collarbone from twelve feet away.[6]

The plaintiffs' complaint refers to the use of a beanbag shotgun from close range as a use of force that "can cause serious injury or death." According to the complaint, the operative Newton Police Department (NPD) policy identifies the beanbag shotgun as a weapon that delivers "blunt, non-lethal force" that is "intended to incapacitate the subject and prevent further aggressive actions." The policy describes the force inflicted as "greater

---

[6] The complaint alleges that Chisholm misfired the beanbag shotgun and so Conlon was not hit but nonetheless contends that Chisholm's unlawful conduct led to Conlon's fatal shooting moments later. The majority assumes, correctly in my view, that we must evaluate the immunity argument as if the beanbag shotgun worked as expected to immediately incapacitate Conlon.

than that of a thrown fastball by a major league baseball pitcher" and accordingly limits an officer's use of the shotgun to circumstances where lesser forms of force are ineffective or inappropriate. See Jennings v. Jones, 499 F.3d 2, 11-16, 19-20 (1st Cir. 2007) (noting that evidence regarding officer training is relevant in excessive force inquiry).

There is also caselaw that supports that firing a beanbag shotgun from close range "can cause serious injury or death." See, e.g., Deorle v. Rutherford, 272 F.3d 1272, 1279 (9th Cir. 2001) (beanbag projectile shot from thirty feet away "removed [the individual's] left eye and lodged pieces of lead shot in his skull"); Glenn v. City of Columbus, 375 F. App'x. 928, 930 (11th Cir. 2010) (unpublished) (suspect died from internal bleeding after being shot by a beanbag gun from a distance of twenty-one feet); Myers v. Brewer, 773 F. App'x 1032, 1035 (10th Cir. 2019) (unpublished) (suspect died from a beanbag round shot to the chest from a distance of six-to-eight feet); cf. Mercado v. City of Orlando, 407 F.3d 1152, 1155 (11th Cir. 2005) (suspect suffered a traumatic brain injury from a shot to the head by a similar less-than-lethal "Sage Launcher," which delivers "approximately the energy of a professionally-thrown baseball," after the weapon was fired from a distance of six feet). Based on the NPD policy and the assembled cases, I consider Sergeant Chisholm's alleged use of the beanbag shotgun against Conlon from twelve feet away to

constitute a substantial imposition on Conlon's Fourth Amendment interests.

I next consider whether this substantial intrusion was warranted under the circumstances. Under Graham, the relevant factors to consider include: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396.

I start with "the severity of the crime" at issue. According to the complaint, although the police originally arrived on scene to investigate the report of an armed robbery of a candy store, when Sergeant Chisholm used the beanbag shotgun that was no longer the police's understanding of the event. See Lachance, 990 F.3d at 25 (stating that the use of force must be "evaluated for objective reasonableness based upon the information the officers had when the conduct occurred" (quoting County of Los Angeles v. Mendez, 581 U.S. 420, 428 (2017))). By then, the officers on site had determined that Conlon was suffering "a mental health issue"; the captains in charge had indicated to the subordinate officers that there was "all the time in the world" to resolve the situation; and officers with training in metal health emergencies had been summoned to the scene. Based on these alleged facts, a reasonable police officer in Chisholm's position when he fired the beanbag shotgun would have understood the incident to involve an

- 34 -

agitated person in the throes of a mental health emergency and not a criminal attempting to flee from an armed robbery.

Likewise, the second and third Graham factors -- whether Conlon posed an immediate threat to officer safety and whether Conlon was actively resisting or attempting to evade arrest when force was used -- lead me to conclude that the substantial intrusion on Conlon's Fourth Amendment rights was unwarranted under the circumstances.  See Graham, 490 U.S. at 396.

According to the complaint, before Sergeant Chisholm attempted to fire the beanbag shotgun at Conlon, Officer Scaltreto had spent approximately twenty minutes negotiating with Conlon to disarm himself on the third floor of the apartment building. During that time, Conlon held the same small kitchen knife that he possessed outside the candy store, and for some portion of the interaction, he also held a fire extinguisher.

Initially, Conlon declined the police's request to drop the knife and fire extinguisher.  But Conlon at no point used these physical items to harm, attempt to harm, or threaten to harm another person.  And the complaint further alleges that Conlon "did not make any verbal threats that he would hurt the officers or anyone else besides himself."

As Officer Scaltreto spoke to Conlon, Conlon indicated that he believed that he was participating in a simulation and asked to speak to his father. Adopting Conlon's premise, Scaltreto

told Conlon that the simulation would not permit contact with his father unless he dropped the knife. Officers also promised Conlon that he would not be harmed. Conlon eventually complied with Scaltreto's request to place the knife on the floor. When Scaltreto then asked Conlon to do the same with the fire extinguisher, he complied with that request too.

At that point, according to the complaint, Conlon was unarmed, in compliance with officer instructions, and barricaded on the third floor of the apartment building where at least eight other officers were present. There were no civilians in the building and additional officers were present on the lower floors.

It is a fair inference from these alleged facts that when Sergeant Chisholm used the shotgun, Conlon posed a minimal risk "to evade arrest by flight" or threaten "the safety of the officers or others." See Graham, 490 U.S. at 396. Conlon had acceded to officer commands and the situation had de-escalated. There is no suggestion from the complaint that after Conlon voluntarily disarmed, a police officer gave him further commands such as to give himself up, place his hands up or on his head, step further away from the knife, or take any other similar action. There is also no suggestion that the police employed any lesser type of force to effectuate an arrest before Sergeant Chisholm fired the beanbag shotgun, even though NPD policy required considering such options. See Glenn v. Washington County, 673

F.3d 864, 876 (9th Cir. 2011) (stating that "police are required to consider what other tactics if any were available, and if there were clear, reasonable, and less intrusive alternatives available to the force employed, that militates against finding the use of force reasonable" (citation modified)).[7]

Rather, the complaint alleges that, immediately after Conlon voluntarily disarmed, Sergeant Chisholm fired the beanbag shotgun at Conlon's upper body from close range.  Under the circumstances, such conduct was unreasonable.  See Jennings, 499 F.3d at 15 (stating that it is a "common sense proposition that it is not reasonable for police officers to increase their use of physical force after an arrestee who has been resisting arrest stops resisting for several seconds").

This is especially so considering the complaint's allegation that the police knew that Conlon was suffering a mental health crisis.  While using escalatory but less-than-lethal force against a dangerous criminal may end a confrontation, doing so to subdue a person in the throes of a mental health emergency "may, in some circumstances at least, exacerbate the situation." Deorle,

---

[7]    The majority takes the view that officers could have reasonably concluded that Conlon remained a threat because the knife was still within reach and therefore methods involving a lesser amount of force would be insufficient.  The critical allegation in this case, though, is not that Conlon potentially still had access to the knife, but that he had just complied with Officer Scaltreto's request to drop it.

272 F.3d at 1283. Here, based on the alleged facts in the complaint, a reasonable officer on the scene would have viewed Conlon as "an unarmed, emotionally distraught individual," and thus understood the encounter to pose a different set of concerns from those presented by a standoff with "an armed and dangerous criminal." Id. at 1282; cf. Gray v. Cummings, 917 F.3d 1, 11 (1st Cir. 2019) ("[T]he level of force that is constitutionally permissible in dealing with a mentally ill person 'differs both in degree and in kind from the use of force that would be justified against a person who has committed a crime or who poses a threat to the community.'" (quoting Bryan v. MacPherson, 630 F.3d 805, 829 (9th Cir. 2010))). In situations like this, "the use of officers and others trained in the art of counseling is ordinarily advisable, where feasible, and may provide the best means of ending a crisis." Deorle, 272 F.3d at 1283. Yet, even though the complaint alleges that such officers had been called and were enroute, Sergeant Chisholm fired at Conlon anyway.

In sum, the complaint alleges that the police confronted Conlon, a mentally ill man holding a small kitchen knife, in the hall of a third-floor apartment building where he was surrounded by police and no civilians were present. Based on police negotiations, the situation seemingly de-escalated when Conlon disarmed himself based on police promises that he would not be hurt and that they would arrange to call his father. Having

- 38 -

de-escalated the situation, law enforcement's very next step was for Chisholm to escalate matters by firing a beanbag shotgun at Conlon from close range. If, as the complaint alleges, Chisholm took that step without evidence of further escalation by Conlon or Conlon failing to follow additional officer commands, he, in my view, acted unreasonably under the circumstances and thus violated Conlon's Fourth Amendment rights.

## B. Clearly Established

I now turn to the second component of the qualified-immunity inquiry -- whether the unlawfulness of Chisholm's conduct was clearly established when the alleged misconduct occurred. See Lachance, 990 F.3d at 20. In concluding that Sergeant Chisholm was entitled to qualified immunity, the majority decides that Chisholm did not violate clearly established law by attempting to use the less-than-lethal beanbag shotgun in an effort to bring the encounter with Conlon to a rapid end and thereby "reduc[e] the risk to all in the encounter."

I respectfully disagree with this conclusion. In my view, Sergeant Chisholm's deployment of such force in the de-escalated posture he allegedly faced violates clearly established Fourth Amendment law. Since at least 2007, it has been clearly established in this circuit that "the law [prohibits] the use of increased force on a suspect no longer offering resistance . . . ." Heredia v. Roscoe, 125 F.4th 34, 47 (1st Cir.

2024) (quoting Jennings, 499 F.3d at 17). Indeed, we have stated that this principle is "readily apparent even without clarifying caselaw." Id. (quoting Jennings, 499 F.3d at 17).

We have applied this principle at least twice to deny an officer qualified immunity. In Jennings, an individual was "challenging authority and resisting arrest," which justified the use of force. 499 F.3d at 11. However, we held that a police officer violated clearly established law by increasing the quantum of force after the individual had stopped resisting for "several seconds." Id. at 14. We described the officer as having breached the obvious restriction on "the increased use of force on a previously resisting but now non-resisting arrestee." Id. at 18.

Similarly, in Raiche v. Pietroski, 623 F.3d 30 (1st Cir. 2010), we decided that qualified immunity was unavailable to a police officer who tackled a person after the person stopped fleeing in compliance with an officer's command and who presented no indicia of dangerousness. See id. at 39; see also Parker v. Gerrish, 547 F.3d 1, 10 (1st Cir. 2008) (concluding that there was a Fourth Amendment violation based on the use of a taser against a non-presently resisting person even though the person had harassed and resisted the officer earlier in the encounter).

Certain courts of appeals have applied this principle in the specific context of using beanbag shotguns. See Myers, 773 F. App'x. at 1038; Council v. Sutton, 366 F. App'x. 31, 36-37 (11th

Cir. 2010) (unpublished); Deorle, 272 F.3d at 1286.  And others have applied it to the use of additional types of less-than-lethal weapons.  See, e.g., Jones v. Treubig, 963 F.3d 214, 227 (2d Cir. 2020); Goodwin v. City of Painesville, 781 F.3d 314, 328 (6th Cir. 2015); Abbott v. Sangamon County, 705 F.3d 706, 732 (7th Cir. 2013).  It thus appears that there is a clearly established principle that an officer violates the Fourth Amendment by using escalatory force -- including less-than-lethal force -- when a person is no longer resisting or posing an imminent danger.[8]

In my view, the complaint asserts a violation of this established principle.  As discussed above, as alleged, at the time Sergeant Chisholm fired the beanbag shotgun, the police had isolated Conlon inside the apartment building; the police captains had determined that Conlon was suffering a "mental health issue"; and other officers had called for appropriate mental-health assistance.  The police spoke with Conlon inside the apartment building for twenty minutes until Officer Scaltreto successfully convinced Conlon to release the knife.  Even though Chisholm knew that Conlon had just complied with officer commands to release the knife and had thereafter taken no further aggressive or resistive

_____

[8]    The majority cites cases in which various circuit courts have found there was no use of excessive force (or qualified immunity was warranted) based on an officer's use of a beanbag gun.  However, none of those cases involve situations like this one, where the subject allegedly had just complied with a directive from the police to disarm.

- 41 -

actions, Chisholm still fired the beanbag shotgun at Conlon. Thus, the complaint alleges that Chisholm used increased force immediately after Conlon engaged in an apparent show of cooperation by dropping the knife. That conduct, if true, violates clearly established Fourth Amendment law.

In this regard, I share the Ninth Circuit's view that "the 'desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury.'" Glenn, 673 F.3d at 876-77 (quoting Deorle, 272 F.3d at 1281). That is especially so where, as here, the police are "dealing with an emotionally disturbed individual who is creating a disturbance or resisting arrest, as opposed to a dangerous criminal." Id. at 877. "[W]hen [an arrest] is intended solely to prevent a mentally ill individual from harming himself, the officer effecting [the arrest] has a lessened interest in deploying potentially harmful force." Est. of Armstrong v. Vill. of Pinehurst, 810 F.3d 892, 909-10 (4th Cir. 2016).

To be sure, the complaint acknowledges that the confrontation with Conlon began with the police seeing Conlon outside a storefront holding a small kitchen knife after receiving a call about an armed robbery of a nearby store. Moreover, Conlon ignored initial police orders to drop the knife while fleeing toward the neighboring apartment building. Perhaps at that point,

the use of escalatory, less-than-lethal force to facilitate Conlon's arrest would have been permissible. But, as I have noted, at the time Sergeant Chisholm allegedly fired the beanbag shotgun, the situation had evolved. Conlon had not threatened anyone but himself with the knife during the encounter, and he was no longer possessing that weapon when Chisholm fired. Given these alleged facts, Chisholm's action was an uncalled-for escalation of force.

Excessive force cases are necessarily fact dependent, and everything said here is premised entirely on the well-pleaded allegations in the complaint. If the beanbag shotgun claim proceeded, differences, even subtle ones, between what is alleged and what can be proven could change whether Sergeant Chisholm's use of force violated the Fourth Amendment and whether such force could be considered a violation of clearly established law. However, at this stage, we must ask "whether under the plaintiff[s'] version of the facts a reasonable officer should have known that the degree of force used was plainly excessive." Morelli v. Webster, 552 F.3d 12, 25 (1st Cir. 2009). Because I believe that the version of events alleged in the complaint meets that standard, I would allow discovery to proceed on the beanbag shotgun claim.